## BRIGGS *a.* MACKELLAR.

*New York Common Pleas ; before Hon. C. P. Daly, June,* 1855.

PRACTICE IN LEGISLATIVE BODIES.—COMMITTEES EMPOWERED TO
EXAMINE PERSONS AND PAPERS.—LEGISLATIVE POWER OF NEW
YORK COMMON COUNCIL.

The nature of those usages and customs by which the proceedings of legislative
bodies are regulated,—considered.

The rules of Parliamentary Law, so far as they are applicable under our form of
government, have been adopted by the legislative bodies of this country.

It is a well-established principle of Parliamentary Law, as well in this country as in
England, that either house of a legislative body may institute any investigation
having reference to its own organization, the conduct or qualifications of its mem-
bers, its proceedings, rights, or privileges, or any matter affecting the public
interest upon which it may be important that it should have exact information,
and in respect to which it would be competent for it to legislate.

The power to compel witnesses to appear and testify, is essential to the exercise of
this right of investigation ; and is therefore possessed by legislative bodies.

Either Board of the Common Council of the City of New York has a similar power
to institute an examination into any matters respecting which it is entitled to
legislate, or in respect to which it may be deemed advisable to apply to the legis-
lature of the State to act.

The act of 1855, ch. 20, empowers the judge to whom application is made to compel
a witness to testify before a committee of the Common Council, to do whatever a
court is authorized to do, upon the neglect or contumacy of a witness subpœnaed
in a proceeding pending in such court.

Investigations directed by a Board of the Common Council are to be conducted in
general according to Parliamentary Law. They are subject in particular to the
following rules :

1. The examination of each witness must be confined to the subject under investi-
gation.

2. A witness is not bound to answer any question where his answer would tend
to criminate or degrade him, unless the question is essential to the direct proof of
the matter under investigation.

3. If a witness objects to answer a question, the sense of the committee is to be
taken, and if a majority decide that the question is proper, it is the duty of the
witness to answer.

4. It is in the power, however, of the witness to refuse, for the committee have no
means to coerce him. And in case of a refusal, it is in the province of the judge
to whom application for an attachment (under the act of 1855) is made, to deter-
mine whether the question is proper.

It is competent for either branch of the Common Council to institute an inquiry
into the state and condition of the Police department,—into any frauds or corrup-
tion in the conduct of it, and into the management of it generally.

Briggs *a.* Mackellar.

The propriety of certain questions put to witnesses subpœnaed to testify before a committee of the Board of Aldermen empowered to inquire into the management of the police department,—considered.

Application for an attachment pursuant to the act of February 8, 1855, (*Laws of* 1855, *ch.* 20), against persons subpœnaed as witnesses before a committee of the Board of Aldermen of New York City, for their refusal to testify.

A special committee was appointed April 26, 1855, by the Board of Aldermen to investigate a report made by the Chief of Police to the Board, stating the places of birth of the policemen in the employ of the department, and to investigate also, any and all frauds in the police department. That committee entered upon the investigation, and a number of witnesses were subpœnaed to appear before them and testify.

One of these witnesses, William Mackellar, attended before the committee, and was duly affirmed. The following questions in substance were put to him:

1. What are your position and duties in the police department?

2. What salary do you get?

3. Do you get any compensation above your salary?

4. Have you paid money from the dog pound surplus, since the last meeting of the committee?

5. Why have you retained this money so long?

6. Do you know what disposition was made of a large black trunk sealed or locked, that was received in the office of the Chief of Police some time since, of which no account has been rendered?

But the witness refused to answer either of these questions.

Two other of the witnesses subpœnaed, Timothy Webster and Michael McCann, were sworn, and certain questions put to them, which they refused to answer; and they moreover refused to answer *any questions which the committee might put to them.*

An application was then made to Judge Woodruff of the Common Pleas, in the name of the chairman of the committee, for an attachment against each of the three witnesses. This application was made under the act of February 8, 1855,

(*Laws of* 1855, 24, *ch.* 20), which provides—That the clerk of either Board of the Common Council may issue subpœnas to compel the attendance of witnesses before any committee of such Board ;—That a witness so subpœnaed may be required to testify in respect to any matters pending before the committee ;—That on his refusal to answer any proper questions, a justice of the Supreme Court, or judge of the Common Pleas, shall, on application, issue an order requiring him to show cause why an attachment should not issue against him ; and shall compel him to testify and punish disobedience as if the matter were legally pending in court. An order to show cause was accordingly granted, and was returned before Judge Daly. The argument extended over several days.

*A. Nash*, for the motion. I. The act of February, 1855, itself, gives power to take testimony, in all matters, which any committee of the Common Council can, by law, investigate, and of which the Common Council have jurisdiction, by its charters, or by the laws of this State. 1. In construing statutes, penal as well as others, an interpretation must never be adopted that will defeat the very purpose of the law, if it will admit of any other reasonable construction. (The Emily and Caroline, 9 *Wheat.*, 381.) 2. A statute is to be construed so as to give it a reasonable effect, agreeable to the intent of the legislature. (Gibson & Jenny, 15 *Mass.*, 205.)

II. The intent of the legislature evidently was, to enable the Common Council of the city of New York to take testimony in matters referred for investigation or inquiry.

III. The judge has the right, and it is his duty to give such a construction as will carry into effect the intent of the legislature, which is, that witnesses shall obey the subpœna of the Common Council, and shall appear before the committee, and testify to all matters in their knowledge, pertinent and relevant to the inquiry before the committee. (Allen *v.* Parish, 3 *Hamm.*, 198.)

IV. The witnesses are in contempt for not answering questions pertinent to the inquiry. The court and judge may, and should, issue an attachment against them ; and may, and should, adopt other and further measures to compel the wit-

Briggs *a*. Mackellar.

nesses to appear and testify before said committee, and to punish disobedience, as if the matter were legally pending in the Court of Common Pleas. (Anderson *v*. Dunn, 6 *Wheat.*, 204.)

V. The subject mattter of ·inquiry before the committee was within the jurisdiction of the Common Council, and consisted of *five* subjects : 1. An embezzlement of moneys by Mackellar, received from the dog pound. 2. The fraudulent concealment of property in the office of the Chief of Police. 3. The truth or falsity of the report made by the Chief of Police, in regard to the Police Department of the city of New York. 4. The inquiry related also to the practical operation, and the welfare and efficiency of the department. 5. Whether the policemen, or any of them, were disqualified, by law, to hold their office, under the charters and laws of the State.

VI. The two last inquiries are given to the Common Council, by the act of April 13, 1853. (*Laws of* 1853, 440, *ch.* 228, *art.* 1).

VII. In the present case, the Chief of Police has reported direct to the Common Council. They have become possessed of the report by a voluntary act of the Chief, and have jurisdiction over it and the subject matter of it. What can contribute more to the efficiency of the department than to have all of its members qualified by law to act in it, and to carry on its duties ? Would convicts make an efficient police, or receive the confidence of the public ? Would unnaturalized foreigners be efficient policemen ? Would the practical operations of the police be well conducted if all were aliens, or a part of them were, in exclusion to citizens ?

VIII. The report being before the Common Council, its truth or falsity was a proper subject of inquiry before the committee. The witnesses were bound to answer all questions relative to this branch of the inquiry.

IX. The Common Council had a right to investigate whether any fraudulent concealments of property had been made in the office of the Chief of Police. (*Laws* 1844, 471, *ch.* 315, § 16). Section 25 of the amended charter of the city, passed April, 2, 1849, (*Laws of* 1849, 284, *ch.* 187, § 25) declares that—" Any officer of the city government, or any person employed in any department of the city government who shall

wilfully violate any of the provisions of the charter, or commit *any fraud*, or convert any of the public property to his own use, or knowingly permit any other person so to convert it, shall be deemed guilty of a misdemeanor, and, in addition to the penalties imposed by law, shall forfeit his office, and be forever excluded from receiving or holding any office under the charter.

X. The Common Council have, by charter, the power to make regulations and ordinances to govern the several executive departments of this city, of which the Police Department is one. (*Laws of* 1849, *ch.* 187, *p.* 280, § 10; *p.* 284, § 21). Whether the Police Department have conducted their business according to the charter, and laws, and ordinances of the city, is a proper subject of inquiry by the Committee, and the questions put to the witnesses were relevant to this subject.

XI. The investigation, under the resolution of the Common Council, is carried on to inquire into all the frauds and corruptions of the Police Department, and is strictly within the jurisdiction conferred by section 25, of the amended charter, April 12th, 1853. And such information is required to enable the Common Council to know the practical operations of the present laws and system.

XII. The act of the 13th of April, 1853, (*Laws of* 1853, 440, *ch.* 228), regulating the Police Department, and the amended charter, passed April 12th, 1853, (*Laws of* 1853, 410, *ch.* 217), both relate to the city; and the Police Department is provided for in both laws. 1. Statutes enacted the same session of the legislature are to be construed as one entire act; and to make a latter statute repeal a former one, there must be an express declaration of repeal, or an absolute inconsistency between the two. And, in case of affirmative statutes generally, (*in pari materia*), such parts of the previous statute may be incorporated with the subsequent ones as are consistent with them, and all must be considered in force. (U. S. *v.* Freeman, 3 *How. U. S. R.*, 565. U. S. *v.* Fairbanks, *Ib.*, 636). 2. The powers of the Common Council, under the laws of 1849, 1853, and the amended charter of 1853, must be all construed together, so as to give each their due and just effect, and it will be found

that all may be executed, without infringing upon the other. 3. A new charter does not merge or extinguish any of the ancient privileges of the old charter. (*Haddock's Case, T. Raym.*, 435).

XIII. The law of 1853 (*Laws of* 1853, 440, *ch.* 228) gives the right of removal of policemen to the Commissioners, but it does not take away the right of the Common Council to legislate, and to require the Chief of the Police and the policemen to obey the ordinances and regulations of the Common Council, and to report thereon. In all the States and in the national government the legislature make laws, appoint committees, and send for persons and papers, while the judiciary execute the laws and. try the offenders. The Commissioners of Police may try delinquent policemen; while they do so, it is under the laws and ordinances of the legislature and Common Council; but the Common Council can make the laws.

XIV. There is no act of the legislature which prohibits the Common Council from investigating, at any time, the affairs of the Police Department, and from issuing subpœnas through their clerks, to compel the attendance of witnesses, and to coerce them to testify through an application to this court; nor is there any abuse of the power which can grow up under the present laws. (*Dwarris on Statutes*, 637—639. Hicks' Case, 15 *Barb.*, 160).

XV. Statutes are cumulative in their remedies, when passed as remedial statutes. It may be well that two powers are confided to different tribunals. (The People *v.* Townsey, 5 *Den.*, 70. Same *v.* Safford, *Ib.* 112). Where different remedies are given by different statutes, all are adjudged good. Nor does one remedial statute repeal another by implication, but both statutes must stand and be construed together as one law. (Bowen *v.* Lease, 5 *Hill*, 221). The law does not favor repeals by implication. (13 *Pick.* 343. Lease *v.* Bowen, 5 *Hill*, 221. Foster's Case, 11 *Coke*, 63. Weston's Case, *Dyer*, 347. Thornby *v.* Fleetwood, 10 *Mod.*, 118. *Bac. Abr. Tit. Statute, D*).

XVI. The court has full power to examine into and take cognizance of the laws of contempts. (4 *Black. Com.*, 286). And the objection that these. proceedings were commenced

before Judge Woodruff, and cannot be continued by Judge Daly, is answered by section 27 of the Code of 1851.

In cases of witnesses summoned to attend Parliament, or a Committee of Parliament, if such witnesses give false testimony to the house or committee, they are to be punished. The Commons in Parliament are the general inquisitors of the realm, and may institute committees of inquiry on all subjects within their jurisdiction. (4 *Com. Dig.,* 298, *tit. Parliament, E.* 6). And may inquire of all misconduct and misdemeanors of the members of Parliament. (See 3 *Hatsell's Precedents,* 41). Where it is shown to be the usual practice to examine witnesses before committees of the two houses, on oath, and to punish them for refusal to testify before the committees. The Common Council of New York have many and great legislative powers conferred upon them by their several charters and statutes, and have a right to examine witnesses, and send for persons and papers. In examinations of witnesses before the committees of the House of Lords, the witnesses are usually sworn at the bar of their lordships, and then sent before the committee for examination. (3 *Hatsell's Precedents,* 39. 4 *Ibid,* 124). But by the act of the 9th February, 1855, the witnesses are to be sworn by the committee—section 3— and, for refusal to testify, are to be attached and punished on application to the Court of Common Pleas or the Supreme Court ; our application is to a Judge of the Common Pleas.

*J. D. Burchard* and *J. T. Brady,* in opposition.—I. The law is well settled, that a body like this committee, or any magistrate or inferior jurisdiction, must show explicit authority for the power it claims to exercise, and can claim no sanction for its acts by intendment or presumption.

II. The committee had no jurisdiction to enforce the attendance of Mackellar, or to require him to answer any or either of the questions put to him.  1. It does not appear from the papers served that the committee was empowered to " ascertain the truthfulness " of the report made by the Chief of Police, as stated in the resolution of April 26, 1855.  They were merely appointed to ascertain from him why he had so long delayed his " response to the resolution of February 5,

Briggs *a.* Mackellar.

1855." For proof of this, see the resolution of March 15, 1855.* 2. It appears on the face of the resolution under which Mackellar was summoned, that it was passed for no legislative purpose, but merely to avenge a supposed insult to the committee. It is, therefore, void, as offences against the Board of Aldermen, or its members, cannot be reached or punished in that matter. 3. It also appears on the face of the same resolution, that it was passed under the supposition that the Briggs Committee was charged with the duty of testing the truth of the Chief's report. This was not the case, and the resolution was, therefore, void. 4. The Board had no power to pass either of the resolutions. Yet, if it had, a committee could not exercise under both or either of the resolutions, the power given by the act of February 9, 1855, because:—1. No legislative scheme or object is embraced or stated in the resolutions, or either of them, and the Board of Aldermen, as such, has no other than legislative powers, nor any jurisdiction except over legislative subjects and for legislative objects. 2. That Board had no power to appoint a committee of investigation as to the nativity, history, past lives, or mode of appointment of policemen. 3. Even if it had such power, it could not call upon the Chief of Police to aid in the proceedings, as he is not an officer of the Board nor of the Common Council, nor of the Corporation of the city of New York, nor subject to the orders, nor amenable for his conduct to them, or either of them. He was not under any obligation to report to them as to the matters of the resolution passed February 5. 4. Neither of the matters embraced in the resolution of February 5, would warrant any legislative action whatever by the Common Council, or the impeachment or removal of any officer in the Police Department.

III. But even if the committee had jurisdiction to examine witnesses as to the matters contained in the resolution, it appears that they were not proceeding in good faith to exercise that authority, but under pretence of it, were inquiring about other subjects, in no way connected with them, and this

---

* The substance of the three resolutions referred to is given in the commencement of Judge Daly's opinion.

Briggs *a.* Mackellar.

for the mere object of either gratuitous and impertinent curiosity, political action, or personal malice.

IV. It does not appear that Mackellar was required by the committee to answer the questions, or either of them; but, on the contrary, that he was required by the chairman only, to answer them.

V. It does not appear that this application for the attachment is made by order or suggestion of any one but the chairman of the committee.

VI. The act of February 9, 1855, is defective in this: that it undertakes to give power on the false assumption, that the Judge at Chambers might authorize or issue an attachment, as if the matter were pending in court, and that is not the fact or the law. The power as defined is, therefore, incapable of execution.

VII. The judge now hearing this matter is not legally authorized to grant the attachment. That can only be done by the same judge who grants the order to show cause. Such are the words of the law, and it is an act not to be enlarged by construction. (State *v.* Shreare, 3 *Greenl.*, 57; Ford *v.* Babcock, 1 *Den.*, 158; Bennet *v.* Burck, *Ib.*, 141). " If a particular jurisdiction does not show the matter to be *within* its authority, it must be taken to be *without* it." (Dudley *v.* Mayhew, 3 *Comst.*, 9; Rice *v.* Wilks, 7 *Barb.*, 337; Stafford *v.* Ingersoll, 3 *Hill*, 38).

VIII. This difficulty is not overcome by the act of 1834, (*Laws of* 1834, 118, *ch.* 94). It relates only to proceedings *then* within the jurisdiction of the judges of that court.

*W. C. Noyes*, in reply.—This is not a contest between mere individuals about making impertinent inquiries upon subjects in which they have no concern. It is the Common Council of the city of New York, representing a constituency of over half a million of persons, wielding a legislative power superior to that controlled by many of the States, as well in reference to taxation as to the great purposes of government, and all those things which come within the scope of legislative duties, which invokes judicial aid. And the question is, whether, in exercising that governmental authority under the ancient charters of the

city, and under the laws which have been passed, from time to time, since these charters were given, for the purpose of improving the condition of the people, they may inquire into alleged abuses, and may institute proper reforms in the city government.

One of the parties against whom this complaint is made, is clerk to the Chief of Police, himself a mere subordinate to the head of the Police Department, who is the Mayor, and this clerk is appointed with the concurrence of the Board of Aldermen; so that in respect to William Mackellar, he holds his office by the consent of the very body which has instituted this inquiry, and whose power he defies. The others are two policemen, appointed by the Commissioners of Police, under the recent system; and they are, each and all of them, subordinate; first, to the Chief of Police, and then to the head of the executive department, the Mayor; and, lastly, and above all, and peculiarly, to the Common Council and the Board of Aldermen. And although the power of removal for offences is now confided to another body, still, all *legislative* power and control which the Common Council originally had over this executive department, from the Chief and his immediate subordinates down to the last policeman,—all *that* power is retained.

Now, if the objections taken on this case in reference to the power of the Common Council be well founded,—if these subordinate and inferior executive officers, the policemen, may refuse to answer any inquiries put by the Common Council— if the Chief of Police may refuse to report to them, as it is contended here he may,—if all inquiry in relation to the acts of this important executive department is beyond the reach of the Common Council, then what is the result? It is obvious. They have nothing to do with the efficiency of the department. They have nothing to do with inquiries into its character; how it is composed; of what persons; whether they are honest or capable. They have nothing to do with inquiries in regard to its strength; whether the officers perform their duties properly or not. They have nothing to do with the question whether those officers are properly appointed; whether they possess the requisite qualifications to receive an appointment, such as

citizenship, residence, age, character, and everything of that description. They have nothing to do with the *morale* of the department, although they are the supreme legislative power of the city, for the purpose of municipal government. So that we have a body of men, more than a thousand strong, utterly independent of the control of the Common Council—I mean, of course, the legislative control—and no inquiry can be made into any of these matters when it is sought, and when the information is only intended to be employed for strictly legislative and municipal purposes connected with the city government. This excludes the Common Council from the use of all compulsory means of inquiry into the constitution, character, and efficiency of this department. If the Common Council cannot compel a policeman to answer, a committee cannot do it; nobody can do it; and we have, in effect, here, a standing army of men selected to hold their offices during good behavior, which is virtually an appointment for life—the same as that of the judges of the Supreme Court of the United States—and the legislature of the city have no right to inquire, and no means of inquiring into its condition or usefulness; no means of instituting any reforms of any description which the exigencies of the public service may demand. The body itself may become as corrupt as the worst body of paid soldiery in the world; they are not responsible, unless it be to the judicial tribunal, only constituted to try them for offences, the Board of Commissioners, or to the executive head of the department, the Mayor. And the argument goes so far as to insist that when the second chief of this department, the Chief of Police, (who is second in respect to the Mayor), is asked, in regard to the state of the department, by the Common Council, he can refuse to answer, and the law will justify him in refusing to answer.

The question is, whether this large body of men, appointed, especially, for the purpose of carrying the laws and ordinances of the State and of the city into execution, is, unlike every other department in the city, independent of the legislative control of the Common Council. The principal questions, then, that were put to the witnesses, in this case, are substantially of no great importance. It is a great question of power

that is in issue, and the point is, whether the State legislature have separated the police department entirely from the legislature of the city, divorced it from all control of the municipal government, and confided it to an independent body. The question is, whether the powers of legislation conferred upon our municipal government, by all the charters of the city, and by repeated laws, do not authorize such an inquiry for general legislative purposes.

Now, let me glance at that power for a moment. I say, in the first place, that it existed in Parliament, and was conferred by the charter. (*Comyn's Digest, tit. "Parliament,"* (*II*) 1; 4 *Inst.*, 36). And I do not refer to the power of Parliament as a court, but simply as to its legislative power. And in that respect, it is said in these authorities that its power is not limited, but is absolute as to all things and persons.

DALY, J.—I do not wish to abridge the course of your argument, but there can be no doubt of the power of Parliament, or of any legislative body, to examine witnesses before its bar, and to appoint a committee with the power to examine witnesses, or as it is expressed, " with power to call for persons and papers." That power has been exercised by Parliament, and by each of its houses, independent of the other.

*Noyes.*—And your Honor will also, I suppose, concede, that they may commit, during the session, for contumacy.

DALY, J.—I understand it to be well settled, that either house in the British Parliament may determine the laws of its own proceeding independent of the other; that in regard to every proceeding preliminary to legislation, they are the sole judges of what rules or laws shall be adopted by them ; that either house of Parliament may examine witnesses for any purpose connected with legislation, or which may become necessary for the purpose of legislation, either before the bar of the house, which was the original mode, or by appointing a committee, with power, to examine the witnesses ; that if a witness refuses to obey the demand of the house to appear at the bar, or refuses to obey the order of the chairman of the

committee to appear before him, application may be made to the house, and the witness committed for contempt, or imprisoned, at the discretion of the house, during the continuance of its session. And further, that the constitution of the State has prescribed the same rule in regard to our legislative bodies, by declaring that they shall be the judges of the laws of their own proceedings; and, in reference, more immediately, to this particular case, the Revised Statutes authorize the appointment of committees to examine witnesses before either house, and either house has power to punish for contempt or refusal. I suppose it to be settled in this State, not merely by the practice of its legislative bodies, but by express statute, that either body of the legislature may direct the examination of witnesses before a committee.

*Noyes*.—That saves me the labor of dwelling at length on this branch of my argument. I shall not attempt to enforce those propositions at any sacrifice of time. The doctrine is stated in this form in the older books, that, "The Commons' Committees are the general inquisitors," not used in a bad sense, "for the whole realm," that is, the popular body of the legislature, and they may inquire into all subjects, and bring witnesses before them on matters of religion, justice, trade, privileges and elections. (*Com. Dig., Tit. Parliament, E.* 6, 4 *Inst.* 11). And in the case of the Trustees of Albion *a.* Tanner, (5 *Hill*, 151), the same power is adjudged to exist in all municipal governments, modified, of course, by the particular constitution of each municipality, and by the laws of the State.

So potent is this power, that a commitment by the House of Commons, without assigning any cause for it, except the party's contempt, cannot be inquired into. The Court of King's Bench invariably refused to discharge prisoners so committed. (Rex *v.* Abbott, 14 *East*, 148, 151; Rex *v.* Gossett, 3 *Perry & D.*, 349; *S. C.*, 8 *Dowling's Pr. R.*, 451); but in the case of the Sheriff of Middlesex, (11 *Ad. & E.*, 273), it was decided, that if the warrant of commitment upon its face showed there was no good cause for it, then it might be inquired into ; but if there was a

Briggs *a.* Mackellar.

general commitment for contempt, the Commons are the supreme judges, and the matter cannot be inquired into.

In 1702 and 1710, they imprisoned parties who kept witnesses away, and tampered with them; they also punished those who gave false testimony. (*Com. Dig., Tit. Parliament, E.*, 11). In one of the cases the Committee for Justice, one of those inquisitorial committees of the House of Commons, summoned the judges before them, and examined them in person as to the misdemeanors alleged against them, although they were subject to removal by the king, and to impeachment. (1 *Siderfin*, 338). All this was done before the passage of the English act in 1770, (10 *Geo.* 3, *cap.* 16), by which the same power was conferred on the Election Committee of the House of Commons. It is established, then, and there is no doubt about it, that, although a party may be subject to trial for the offence elsewhere, yet he may be summoned and examined in regard to the transaction, by a committee of the Commons, for the purposes of legislation. The act referred to authorizes the Committee of Elections of the Commons to summon witnesses and punish them for contempt.

This same power to summon them was conferred upon the Common Council of New York by the original charter, and the language is exceedingly important. It is provided in section 7 of *Dongan's Charter*, as recited in Montgomerie's, that, " for the *better government* of said city, the liberties and precincts thereof, there shall be forever hereafter, within the said city, a Mayor, Recorder, Town Clerk, six Aldermen," &c.; that the Common Council may make " laws and ordinances for the good rule, oversight, correction and government of the said city and liberties of the same, and of all the officers thereof," &c. So in *Montgomerie's Charter*, which was granted in 1730, some of the recitals in which are of much importance, because they show that this was regarded as a frontier town, at a great distance from the parent government, and almost absolute legislative control was necessary in it. This charter, also, in section 14, says:—" The Common Council of the city, for the time being, or the major part thereof, have, and may, and shall have, full power, and authority, and license, to frame, constitute, ordain, make, and establish, from

time to time, all such laws, statutes, rules, ordinances, and constitutions, which, to them, or the greater part of them, shall seem to be good, useful, or necessary for the good rule and government of the body corporate aforesaid, and of all officers, artificers, ministers, inhabitants, and residents of the city."

Without going into details on this matter, it is sufficient to remark that, in every act which has been passed on this subject—and, I think, in the first section of every act—is the distinct declaration that the original legislative power is confirmed to be retained in the Common Council in all its original force. So important were those instruments deemed to be, that in our various State Constitutions, from the Constitution of 1777 down—in the Constitution of 1821, and in that of 1847, the chartered privileges of the city of New York are confirmed, and all the privileges which they have exercised re-established—making it, as it always was, a free city—one of the freest cities in the world.

Your honor will find, by looking in Chancellor Kent's Notes on the City Charter, (Note 29), what was his view of this legislative power. He says, " I apprehend that the general powers of the Common Council, as described in this (the 14th) section of the charter, remain in full force." But I need not enlarge upon that. I now call your attention, for a moment, to the amendatory act of 1849, section 21, which makes " the several executive departments, and the officers and clerks thereof, subject to the legislative regulations and directions of the Common Council, so far as the same shall not be inconsistent with this act, and the duties thereof shall be performed in accordance with the charters, and laws and ordinances of the city." The police department was at that time organized, as a separate department, with the Mayor at its head. There was then a standing law requiring heads of departments to report every three months. Watchmen or policemen were an original part of this governmental body, and are provided for in the original charter, just the same as other officers. This state of things continued up to 1853. By this law of 1849, in its twentieth section, any officer of the city government could be removed by the Common Council, except the Mayor and

the members of the Common Council, so that each department of the city government was made subject to the legislative control and direction of the Common Council up to 1853; and up to that time any officer of the government could be removed by a vote of the Common Council. Before that time—though, perhaps, it is not important to inquire into it—the policemen were appointed, not by a Board of Commissioners, but by the old mode, and by the act of 1849, as well as by the act of 1853; everything not inconsistent with them, which was contained in the old laws, was retained as part of the powers of the Common Council. (*Laws of* 1853, 414, *ch.* 217, § 18).

This is what is called the new charter—the first section of which retains the legislative power, and says it shall be vested in a Board of Aldermen and a Board of Councilmen, who, together, shall form a Common Council; so that all the legislative power of the Common Council was retained, and was, of course, exercisable by itself or by its committees, in such a manner as it chose to adopt. It had a right—possessing a portion of the legislative powers of parliament or of the legislature—to call witnesses before it. It is not necessary to contend that they were authorized to imprison the witnesses, but they could, under a by-law, impose pecuniary penalties on the witnesses for not attending, and thus coerce their attendance.

That would be a proper subject for municipal regulation; but after all, it is not important to inquire whether the Common Council had that power, inasmuch as the act renders it unnecessary.

Now, for what purposes could all this be done? As the legislative power of the Common Council is general, they may inquire how the Mayor performs his duty; how the judges of the city courts perform theirs; how the Chief of Police performs his; and what is the condition and efficiency of the police force. They may inquire into everything in respect to which they have power to pass laws or adopt ordinances, or in respect to which they may deem it necessary to apply to the legislature to confer other powers upon them, or to legislate directly themselves for the benefit of the city. They may, therefore, institute any inquiry for the purpose of ascertaining whether there is anything in the administration of the public

affairs of the city which requires their correction, or correction by the superior body, the legislature.

The inquiry then is, has the act of 1853 made any change in this respect in relation to the police department? The first section of the third article of that act gives the Commissioners of Police, consisting of the Mayor, Recorder, and City Judge, the power to appoint policemen; the Chief being appointed in exactly the same way as he was previously, that is, by the Common Council, on the nomination of the Mayor. There has been no change in reference to his position. He may be removed or impeached by the Common Council in the old mode. Policemen, however, can only be tried by another Board, constituted a little differently from the appointing power. But they may be suspended by the Captains and Chief of Police, without removal; and they are made removable only by the Board of Commissioners, for cause, and after a trial. By the third article of the second section, they hold their offices during good behavior. The only effect of this act is to change the tribunal which is to try them for specific offences, by the commission of which they forfeit their offices, or to inquire into those things which render it necessary that they should be no longer policemen, in case of their want of efficiency. It does constitute this new tribunal, undoubtedly. Everything, however, not inconsistent with this mode of trial, and with its objects, is retained. The power of removal is retained in respect to the Chief of Police, and there is nothing whatever impairing, in the slightest degree, the power of the Common Council, in respect to its legislative capacity, to inquire and examine into the condition and efficiency of the department, and in reference to the efficiency of each individual member.

As a necessary thing, for municipal purposes, the general right of inquiry for the purposes of legislation must be retained. There is no inconsistency between the absolute power of trial being vested in another body and this legislative power being vested in and retained by the Common Council. Nobody will pretend it.

Now, let us see for what purposes and under what circumstances this legislative control,—this right of inquiry for pur-

poses of legislation—must be retained. By section 17 of the act of 1830, the Mayor, as head of the department, must report to the Common Council very frequently. By the act of 1853, (*Laws of* 1853, 445, *ch.* 228, *art.* 3, § 5) the Chief of Police must every six months report to the Mayor, and the Mayor must transmit his report to the Common Council.

These reports go to the Common Council as the fountain head of power and authority; of course for the purpose of their legislative action. By the act of 1853, article 1, section 3, the policemen possess all the power of constables. They are executive officers in that respect. There are certain State laws which authorize only constables to perform certain duties. By article 1, section 4, of this act—" The Chief of Police, captains, lieutenants, and sergeants of police, policemen and doormen, in accordance with the rules and regulations prescribed; *in conformity to the laws of the United States, of this State,* AND THE ORDINANCES OF THE COMMON COUNCIL, shall watch and guard the city day and night, and protect all general and primary elections."

Now, is it possible that the Common Council have not the power to inquire into the condition and efficiency of the department, even though it may involve an inquiry developing facts requiring that the whole body of them should be dismissed? The police are specifically commanded to enforce all the laws and ordinances of the Common Council. The police are bound to attend fires; to look after junk-shops and pawnbrokers. There is a provision in the fourth section of article four of this act of 1853, that no member of the Police Department shall demand or receive fees without the written consent of the Mayor, and then only upon special reasons. There shall be no legalized extortion. It is declared to be a misdemeanor to receive such fees; and removal follows. By the act of 1813, which is in force, (*Davies' Laws Relative to the City of New York,* 472), there are three sections of great importance in regard to it, (§§ 30, 31, & 32). It is the duty of the justices and other officers to account before the Mayor, or before the Recorder, for the public moneys received by them. An inquiry is thus instituted in relation to moneys taken for

public purposes, and required to be paid over.   These sections are retained.

Now, all these are matters in respect to which legislation may become necessary at each session of the Common Council, because there may be abuses which need reform; and there may be changes required by the exigencies of business, and by the condition of the department.   And if the city legislature cannot reform these abuses, they may go to Albany, and ask the supreme power to reform them.   Whenever it is suggested that a policeman has received fees which he was not entitled to receive, or that he neglected a duty, or that he is incapable from physical health to discharge his duties, the Common Council may take cognizance of and send the matter to a committee to inquire into it; and it is no protection, and must form no immunity to say that he may be tried and removed by the Board of Commissioners for the same thing.   So they may inquire into the question whether an appointment has been properly made, although the appointment emanates from another tribunal.   This law of 1853, as well as the previous laws of 1844 and 1846, required that the policemen should be citizens, and that they should be of full age; and it is a misdemeanor to go into the department without being a citizen and of full age.   And the Common Council have a right to inquire not only into the question whether the policemen have committed this misdemeanor intentionally, but also whether the appointing power itself—the Mayor, Recorder, and City Judge—has neglected its duty, and appointed men who ought not to have been appointed.

The Common Council has a right to inquire into the way in which the appointing power has been exercised.   They have a right to inquire into the conduct of the Mayor, Recorder, and City Judge, in making appointments; and they have a right to do it, in the first place, because they are city officers— strictly so;—also, for the purpose of applying to the legislature, to change the mode of appointment, and for the purpose of regulating matters connected with it themselves; they are charged with the municipal affairs of the city.   They are charged with the control of the executive department, and if the legislature has confided the appointment of persons in any

executive department to an improper tribunal, or to one improperly constituted, the Common Council may inquire into it, for the purpose of asking the legislature to change it. If it be not so, then every abuse existing in a body, which does not derive its appointment from the Common Council, must go unascertained and unredressed.

In general terms, any abuse of office, by any officer, affecting the government of the city, judicial or otherwise, is a matter which may be inquired into by the city legislature ; although these officers are responsible to, and can be removed, for misconduct only, by some other body ; and the fact that the Common Council have the right to ask additional legislation, is a reason why they should have unlimited power to investigate such subjects. I may add, that they may do it for the purpose of directing the Corporation Counsel to prosecute. They may do it for the purpose of directing the criminal prosecuting officer of the city to prosecute. They may do it for the purpose of instituting an impeachment, or directing it to be instituted ; or, they may do it for the purpose of presenting the matter to this Board of Police Commissioners, who have the right to try it afterwards. In other words, they may do it whenever, in their legislative discretion, they think the case demands it, in order that the wrong alleged may be redressed.

They do not engage in such inquiry as a judicial body, or for judicial purposes; they do not do it for the purpose of trial or punishment; they do not do it as a court ; it is simply an exercise of the legislative powers, for the purpose of prévention and remedy by themselves or by the supreme power, the legislature. And a careful distinction is to be drawn between the power of the Common Council in respect to its legislative functions, and the judicial power which is to be exercised by the Board of Police Commissioners. They do not do it as a court of civil or criminal jurisdiction, in any sense. They are charged with the government of 600,000 people—of a much larger number, if we include those constantly resorting here, and being here for temporary purposes. And it is necessary, to the ends of good government over so large a body of people, that the Common Council should

have this power. The error, on the other side, is in treating the committee as a court, and the inquiry as a trial, or for the purposes of a trial. It is merely for governmental purposes. Now, this governmental power of the Common Council cannot be taken away without the plainest and most obvious intention to do so, derivable from the language of the legislature. On this subject, I refer to Hoffman's Treatise on the Laws of the Corporation, pages 66 and 67. He says, " that no law or statute shall be treated as surrendering or restricting a general legislative power held as a trust for purposes of general good, without the most positive language."

Let us apply this to a case with which we are all very familiar. How often does the legislature inquire into abuses by the Canal Commissioners; by the Canal Superintendents; by the State Prison inspectors and agents; by all that numerous body of agents which the State has in its employment, and this, whether it be for purposes of trial or of procuring conviction, or whether it be merely for the purpose of reforming and correcting the abuse, and to provide information on which future legislation may proceed. The analogy is perfect between this class of cases and those in which the Common Council may legislate.

I have confined myself hitherto almost exclusively to a consideration of the question, independently of the act of 8th of February, 1855. That act, as your honor will observe, assumes that the Common Council itself, as a legislative body, does possess the powers now claimed, and may call witnesses before it, and then delegates these powers to a committee; and instead, as the English act does, of giving the power of commitment for contempt to the committe, it gives it to a judicial tribunal. It assumes the power as existing in the legislative body, authorizes the clerk to issue subpœnas for witnesses, the chairman to administer oaths and require witnesses to testify, and then, upon the presentation of proof of the service of a subpœna, and the failure to obey it, it directs application to be made to a judge of this court, or to a justice of the Supreme Court, and an order may be made here requiring the attendance of the witness, and he may be punished if he refuses to testify, just as if the matter were legally pending in this court.

It then provides that false swearing before a committee shall be visited with the consequences of perjury, and that a witness refusing to appear before a committee to take the oath, or appearing, but refusing to answer proper questions, be punished for contempt.

[After some comment upon the propriety of the particular questions put to the witnesses, Mr. Noyes continued.]

Now, then, without going further into detail about this, because I regard the question whether he can be compelled to answer of much more importance than whether these particular questions are to be answered ; the question is, who is to judge of the propriety of these questions? And I answer, that in the first place the committee is the sole judge of the propriety of the questions; and that only in the case where it appears before your honor that a question is obviously impertinent and foreign to any inquiry which the legislative body may propose, is it to be deemed an improper question. I suppose it was the intention of the legislature to confer the power of punishing witnesses for contempt, and to secure the right to put proper questions by a judicial tribunal, instead of the committee ; conferring upon it, after the committee has decided the matter, the right of re-examination ; and my proposition is, that if the questions are nearly or even remotely relevant to a proper subject for legislative inquiry, which the committee see fit to pursue, then they are proper within the meaning of the statute, and the court must compel them to be answered. If they are material in influencing the decision of the legislative body, or in aiding them in their action, or in controlling them in the management of the matters confided to their charge, then they are relevant, pertinent, and proper, within the language of the act. (Dicas *v.* Lawson, 1 *Cromp. M. & R.*, 934).

In this case, however, these questions were all pertinent and relevant. They were within the proper scope of the resolution of April 26. They were on subjects which had been already inquired into, and in part reported upon, and were necessary to its further illustration.

Now, if the court please, I have gone through with this case so far as I deem it necessary, having confined myself as

much as I was able, to the question of power. All that is
contended for is, that the members of the police department
are subject to the legislative inquiry and control of the Com-
mon Council; and that, in respect of all such matters, they
may be brought bodily or singly before the committee and
before the Common Council, and be compelled to answer ques-
tions concerning their department. This inquiry is not for the
purpose of trying these people, or of punishing them. True,
it may develop facts and offences for which they ought to be
punished, but that is a consequence, and not the *object* of the
inquiry. If it turns out in the course of a legislative inquiry
that a public officer has been guilty of a criminal offence, the
legislative power corrects the evil and turns the offender over
to the public prosecutor for punishment.

In conclusion, I submit that as Webster and McCann have
defied the Common Council, they must be attached; and that
as Mackellar has refused to answer questions put to him by a
body having full power to make inquiries, he also must be
attached.

DALY, J.—By the proofs submitted in this case, it appears
that the Board of Aldermen, on the 5th of February, 1855,
passed a resolution, directing the Chief of Police to report to
the Board how many Americans, Irishmen, Scotchmen, Ger-
mans, Frenchmen, Englishmen, and men of all other nations,
were in the Police Department; how many of the present
policemen had been in prison in this or in any other country;
how many were naturalized; how many had been in the
country less than five years, and by whom all the members of
the present police were appointed. No report having been
received, the Board, on the 15th of March following, passed a
resolution appointing a committee, consisting of Aldermen
Briggs, Tucker and Hoffmire, to ascertain from the Chief of
Police, " why he had so long delayed his response." Four
days after the passage of this resolution, the Chief of Police
made his report, and on the 26th of April following another
resolution was passed, empowering this committee to investi-
gate " all frauds and corruptions in every branch of the Police
Department, and also the manner in which the same is and

has been conducted." In pursuance of this resolution, several persons were subpœnaed to appear before the committee as witnesses, among whom were the respondents, Mackellar, Webster and McCann. The respondents appeared in obedience to the subpœna, on the 2d of May, and were sworn as witnesses; but two of them, Webster and McCann, refused to answer several interrogatories that were put to them, and generally refused to answer any questions—the respondent McCann denying the right of the committee to interrogate him. The respondent, Mackellar, had been previously before the committee, and had answered several questions, but upon this day he refused to answer certain questions propounded to him. The present application is made for an attachment against these witnesses, under an act passed by the legislature, at its last session, entitled "An Act to enable the Common Council of the city of New York to take testimony in matters referred for investigation and inquiry," or for such other remedy as may be conformable to, or would be proper, under the act.

By this act, the clerk of the Common Council, or his deputy, is authorized to issue subpœnas, to compel the attendance of witnesses, before a committee of either Board of the Common Council; the chairman of such committee is empowered to administer oaths to the witnesses appearing before the committee, and may require them to testify in respect to any matter pending before it; and upon proof of the service of a subpœna, and of the failure of the witness to attend, or if the witness attends, upon proof of his refusal to take the oath, or to answer any *proper* question, it is made the duty of a judge of this court, or of a justice of the Supreme Court, to require the witness to show cause why he should not be attached, and to adopt other and further measures to compel the witness to appear and testify, and to punish disobedience, as if the matter were legally pending in court.

The cause shown, in the present case, amounts to a denial of the right of the Board of Aldermen to institute any such investigation as that embraced in the resolutions referred to; an objection which makes it necessary that I should determine

whether the Board of Aldermen, in directing this inquiry, have or have not transcended their powers.

By the charter granted by Gov. Dongan in 1688, and by the more extended charter granted by Gov. Montgomerie in 1730, the Common Council were clothed with legislative powers as respects the municipal government of the city, of a very comprehensive character. The body which then composed the Common Council, or the major part of the members composing it, were in general terms authorized, from time to time, to make, ordain and establish, such laws, statutes or ordinances as might seem to them useful or necessary for the good rule or government of the city; and though under the various acts of the legislature amendatory of those charters, changes and alterations have been made in respect to many matters of which the Common Council before had exclusive cognizance, the general power of passing laws and ordinances within the limitations and restrictions imposed by these subsequent statutes or charters, remains. The two bodies, therefore, which now constitute the Common Council, founded as they are upon the principle of popular representation, resemble, in the object for which they were created, the nature of the power conferred, and of the duties imposed upon them, the mutual check which they exercise upon each other, and the order and course of their proceedings, regular legislative bodies. The creation of a municipal corporation has been defined to be " the investing of the people of a place with the local government thereof." (*Vin. Abr.*, *Tit. Corporation*, *A.* 2; People *v.* Morris, 13 *Wend.*, 334); and, as the two branches of the corporation to whom are intrusted the discretionary power of making laws, the Board of Aldermen and the Board of Councilmen should be regarded and treated as legislative bodies. The grant to a municipal corporation of power to legislate, so comprehensive and general as that granted to the Common Council of the city of New York, would seem to carry with it whatever was essential to the full and efficient exercise of the power. If they are to enact laws or pass ordinances for the government of the city, they must have the right, in the preliminary stages of legislation, to adopt or make use of the forms, usages and modes of procedure which experience has

pointed out to be useful, convenient or indispensable, to enable legislative bodies to act advisably, and conduct their deliberations with order and method; and as it will assist to a more clear understanding of the powers which either Board of the Common Council must necessarily possess, as a consequence of the authority conferred upon them to make laws and ordinances for the government of a city, I shall consider very briefly the nature of those usages and customs, which in state or national legislative bodies have the force of law, and by which their proceedings are regulated and governed.

In the political or governmental organization of the country from which our legislative system has been derived, each of the two houses of parliament have, from their earliest known records, fixed and settled their own course of procedure (1 *Bl.*, 102; 3 *Hats.*, 40, *note*); that is, each house has gradually defined its own powers, and determined for itself the mode in which it would proceed in the various stages of legislation, or while deliberating upon matters connected with its own organization, its power, rights, or privileges, except where a certain course of procedure has been made applicable to both houses by the passage of a general statute. When in either house a certain mode of procedure has been adopted in any case, it has become a precedent for the rule and government of that house, in every case thereafter of a similar character; and thus in progress of time a succession of precedents have been adopted, forming together a regular system of procedure, more or less different in each house, which in England is known by the general appellation of parliamentary law—*lex et consuetudo parliamenti*—and which, when once established, is as binding upon the house adopting it, as a law enacted by Parliament is binding upon the nation. (Regina *v.* Paty, 2 *Salk.*, 503; 2 *Ld. Raym.*, 1, 105; 4 *Doug. Elect. case*, 35, 36, *note*).

In this country, the right of either house of the legislature to establish and regulate the manner in which it will proceed is a constitutional right; at least a provision declaratory of the right exists in the constitution of this State, and in that portion of the constitution of the United States, distinguishing the separate powers of the two houses of Congress; and where no constitutional limitation or restriction exists, it is competent

for either of the two bodies composing the legislature, to do, in their separate capacity, whatever may be essential to enable them to legislate. The principles, or rather the rules, constituting parliamentary law, having their foundation in convenience and necessity, have been uniformly received and acted upon in this country; and the binding authority of that law over legislative bodies, so far as it is applicable to our form of government, has been universally acknowledged. Indeed, were it otherwise, the course of legislative procedure, instead of being, as it is, well known, or capable of being ascertained, would be involved in the greatest uncertainty and lead to endless confusion. As in a court of justice, a rule, when once settled in an adjudged case, is binding, thereafter, upon the same court and upon all inferior tribunals, that the law may be known, instead of being left to the uncertain determination of every judge, so in a legislative body, what has once been decided upon as the proper course of procedure, is adhered to thereafter in all similar cases. This is to be understood, however, with some qualification, for it has been the usage in American legislatures, for each house to adopt for its government, during its sessions a series of rules, usually the rules of the preceding sessions with such changes or alterations as are deemed desirable; as well as to adopt, during the session, any rule which is thought to be expedient, but a rule so adopted has effect only upon future cases, for when a case has once arisen for legislative action, it is determined by the existing rule or practice, whatever that rule may be.

It is a well-established principle of this parliamentary law, that either house may institute any investigation having reference to its own organization, the conduct or qualifications of its members, its proceedings, rights, or privileges, or any matter affecting the public interest upon which it may be important that it should have exact information, and in respect to which it would be competent for it to legislate. The right to pass laws, necessarily implies the right to obtain information upon any matter which may become the subject of a law. It is essential to the full and intelligent exercise of the legislative function, and, consequently, the power of either house of the British Parliament, to compel a witness to appear before its bar,

or before a committee to whom a matter was referred for investigation, and to give evidence, as well as the power to punish, in case of disobedience, was, from a very early period, asserted and settled to be the undoubted right of either house. (3 *Hats.* 34 ; 2 *Ib.*, 40, *note* 132, 137 ; 3 *Grey*, 81 ; 10 *Grey*, 165 ; 2 *Rushw. Lex. Parlm.* 74 ; *Hallam's Constitutional History of England*, ch. 16, § 3 ; Burdett *v.* Abbot, 14 *East.*, 1 ; Regina *v.* Paty, 2 *Ld. Raym.* 1105 ; 5 *Dow*, 165, 199 ; Anderson *v.* Dunn, 6 *Wheat.*, 204 ; *Jeff. Parlm. Manual*, § 13.) In American legislatures the investigation of public matters before committees, preliminary to legislation, or with the view of advising the house appointing the committee, is, as a parliamentary usage, as well established as it is in England, and the right of either house to compel witnesses to appear and testify before its committees, and to punish for disobedience, has been frequently enforced. (*Proceedings of the New York House of Assembly, in the matter of the contempt of Moses Jaques and Levi D. Slamm; Jour. of Ass.* 1837, 262, 422, 440, 466, 477, 483, 486; *Ass. Doc. Nos.* 198, 225, 325, 327, 1127). By the rules of the New York House of Assembly, it is made the duty of every standing committee to inquire into the matter indicated by the title of the committee, and to report to the house any information which the committee may deem conducive to the public good. And the right of either house to examine witnesses before its bar, or before a committee authorized to send for persons and papers, or before a person authorized by a committee, or by either house, to take testimony, as well as the power to punish, for contempt, in case of disobedience, is expressly provided for by statute ; (1 *Rev. Stats.*, 376, 4 *ed.*, *Pt.* I., *ch.* 7, *tit.* 5) ; and the mode of proceeding, the manner of issuing compulsory process, and the penalties incurred by witnesses in case of neglect or refusal, are specified.

If it is essential to the intelligent exercise of the office of legislation, that each of the two houses composing the legislature of the State should have the right of inquiry, it would seem that both Boards of the Common Council should possess it also, to enable them to act efficiently, within the more limited sphere prescribed for them. If they are to make laws and ordinances for the government of the city, they

should have the means of obtaining full and accurate information respecting every thing of a strictly municipal character relating to the affairs of the city. The right to examine witnesses, as a part of the ordinary and usual legislative machinery, would seem to follow as incident to the right to legislate, which has been conferred upon them; for it would be inconsistent to hold that they may, under the charters, exercise the power, and yet may not do what is essential to enable them to exercise it properly.

It was urged, on the argument, that the power to summon witnesses, and to compel them to testify, is vested in each house of the legislature, in virtue of its sovereign authority; but such, I apprehend, is not the case. The sovereign authority of the State is primarily in the people, and the manifestation or exercise of that sovereignty is in three co-ordinate branches; the two houses and the executive, the joint concurrence of which, or a vote of two-thirds in each house, when the executive does not concur, being essential before any law can be enacted. No one of the two houses has the sole attribute of sovereignty. Neither body is what Blackstone denominates Parliament. "The place where that absolute despotic power is intrusted, which, in all governments, must reside somewhere;" (1 *Black. Comm.*, 116); for that power can be exercised only by the concurrence of both houses, and resides separately in neither; and, in this country, we have never recognized what in England is termed the omnipotence of Parliament. (Anderson *v.* Dunn, 6 *Wheat.*, 204). It is not, therefore, by virtue of its absolute sovereignty, that each house of the legislature exercises the power of compelling witnesses to appear before it, or before its committee, but because it is necessary to enable it to co-operate and perform its part in the duty of legislation. It exists, for the same reason, that a similar power exists in courts of justice, which is derived from no statute, conferred by no constitution, but is coeval with the existence of such tribunals, having its foundation in the very nature of the judicial institution. (4 *Black. Comm.*, 286). For unless a court had authority to summon witnesses, and compel them to give evidence, it could not perform its natural and legitimate functions.

That the Common Council, therefore, independent of the statute under which their proceedings have been instituted, as a municipal corporation, clothed with legislative powers, had the right, inherent in either Board, of investigating municipal matters, in the ordinary legislative mode, together with the right of summoning witnesses to appear and testify, I have not the slightest doubt; and if there was any doubt before, it is removed by the act referred to, the title, as well as the provisions of which, clearly recognizes the existence of the right. It is called in its title, " an act to enable the Common Council to take testimony in matters referred for investigation and inquiry." It is argued, that the title forms no part of the act, and this is true of statutes generally; for, in the earlier period of legislation, the title was usually affixed by the clerk, after the bill had passed in the house where it originated, and, consequently, formed no part of the enactment; (Potter's Case, 3 *Coke*, 33 ; *Dwarris on Statutes*, 653). And though the practice is now different, from the changes and alterations which bills undergo in the course of their passage, the reason of the rule continues, as those changes are not always consonant with the title, and sometimes are entirely inconsistent with it. But by the State Constitution of 1846, (*Art.* 3, § 16) it is declared, that no local or private bill shall embrace more than one subject, and that that subject shall be expressed in its title. The act in question is a local act, being limited in its operation to the city of New York, and its title, therefore, must be taken as expressive of its subject matter.

Not only had the Common Council the right to examine witnesses, but it was within their power to enact ordinances, imposing pecuniary penalties upon witnesses neglecting to attend, or refusing to testify. (*Grant on Corporations*, 86 ; *Wilcox on Municipal Corporations*, 164). Whether the provision in Magna Charta, incorporated in our Bill of Rights, that no one shall be imprisoned, except by due process of law, would, as has been held repeatedly in respect to municipal corporations, (Wood *v.* The Mayor of London, 12 *Mod.*, 686 ; King *v.* Clark, 1 *Salk.*, 349 ; Wood *v.* Searle, *Bridg.*, 141), deprive either Board of the Common Council of the power of imprisoning a disobedient witness, it is not in this case necessary to

inquire, the act of 1855 having provided a mode by which the disobedience of the witness may be punished by imprisonment, if necessary.

It is objected, however, that the provision in this act which declares, that the judge to whom the application shall be made, shall adopt such measures to compel the witness to appear and testify, and to punish disobedience, as if the matter were legally pending in court, does not indicate any measure which the judge could adopt, as it is a matter which could not be legally pending in court, and because the matter is not brought before the judge in a proceeding in court, but is brought before him out of court, where, *ex officio,* he has no power to order an attachment, or do any of those acts which it is competent for a court to do, in cases of contempt. There is nothing in this objection. The statute is sufficiently plain to indicate what was intended by the legislature, and it points out, with the necessary clearness and certainty, what the judge is to do. He is to do what a court is authorized to do, upon the neglect or contumacy of a witness; as, where a witness, subpœnaed to appear and give evidence upon a trial, neglects to appear, or appearing, refuses to answer a question which the court has decided to be a proper one, the court, in the first case, may order that an attachment issue, directing the sheriff to bring the witness before it; and upon his being brought in, the court may fine or imprison him; and, in the other case, the witness being present, the court may commit him to prison for his disobedience. To effectuate the purpose of the statute, the judge is clothed with all the power which a court would possess, in the case of the neglect or of the contumacy of a witness; and, for the purpose of compelling the attendance of the witness, or of punishing him for his contempt, the judge may do, out of court, whatever he might do if formally sitting in court.

Nor is the statute, in this respect, either novel or without precedent. Many powers are conferred upon a judge sitting out of court, which, before the statutes conferring them, could be exercised only by a court. In proceedings supplementary to execution, the Code authorizes a judge of the court to do many acts, such as the granting of process of attachment to

compel the appearance and examination of the defendant, which, before the Code, could be done only by a court. It is the same in the examination of witnessess *de bene esse;* the examination of parties before trial, and in many other cases. And the doctrine is as old as Lord Holt, that where a new authority is constituted with power to fine and imprison, the person or persons invested with such authority, have, for that purpose, whatever belongs to a court of record, and need not pursue strictly the form and method of a court, but may, to carry out the purpose of the statute, proceed in a summary way. (Groenvelt *v.* Burwell, 1 *Comyn's R.*, 76).

But the right of either Board of the Common Council to investigate public matters has its limitations; for even the legislature itself can exercise only such powers as have been delegated to it, and is confined strictly within them. (Taylor *v.* Porter, 4 *Hill*, 144). It is in the power of either Board to investigate any matter they may think proper; but any inquiry they make must be clearly within the scope and object for which they exist as a political body. They are not, I apprehend, confined strictly to matters upon which it would be competent for the Corporation to pass a by-law or ordinance; but the right of inquiry, I think, extends to other matters, in respect to which it may be necessary, or may be deemed advisable to apply for legislative aid. The power inherent in them, as public bodies, is a public trust, to be executed for the general benefit of the community for which they act. (The People *v.* Morris, 13 *Wend.*, 331.) And it is their duty not only to pass such laws as, or ordinances for, the good government of the city as they may have the power to enact; but also to inquire, from time to time, how far, or in what cases it may be necessary, for the efficient and better government of the city, to apply to the legislature for the passage of necessary laws. There are many matters not comprehended within the powers conferred by the charter, or where the power is doubtful, in which it is necessary, and in some cases annually, to apply to the legislature for the enactment of laws:—such as the levying of a public tax; the right to impose an assessment; to take private property for public use, or to enforce a lien against the property of an individual, for

improvements made upon it or repairs done. (*Hoffman's Treatise upon the Estate and Rights of the Corporation*, 72). It has consequently been customary from the first sitting of a colonial Assembly to the present time, for the Corporation to apply to the legislature in the form of a petition for the passage of laws necessary for the better government of the city. In the growth and development of a metropolis like New York, it is impossible to foresee in advance, and provide general laws for every exigency that may arise, and hence such applications have been, and must continue to be, of constant occurrence. To all such matters, therefore, the right of inquiry must extend, or the Common Council could not discharge efficiently the duty expected from them.

As to the manner in which such investigations must be conducted, and the power of either of the Boards or of a Committee, in interrogating witnesses, and the rights and duties of the latter, it will be necessary again to recur to the rules and usages established as parliamentary law. In the first place, the examination of the witnesses must be confined to the subject which is under investigation, and they cannot be asked any question not relating to it, (3 *Grey*, 81 ; 10 *Grey*, 165 ; 2 *Hats*. 130, 137). Nor is a witness bound to answer any question that would tend to criminate him, (*Bar. & Aust.*, 251, 383, 390 ; 1 *Peck*, 437 ; *Ib.*, 35 ; 3 *Perry & Knapp*, 206 ; 3 *Knapp & O.*, 243,) or that would tend to degrade him, unless the question asked is essential to the direct proof of the matter under investigation. (1 *Mo. & M.*, 168). When the examination is before a committee, the questions are usually put by the chairman, though any member may put one, and if the witness refuse to answer, the proper course is to take the sense of the committee, and if the majority decide that the question is proper, it is the duty of the witness to answer it. (2 *Hats.*, 136—2 & 6 ; *notes ;* 4 *Grey*, 275 ; 10 *Ib.*, 165). I say it is his duty, because, if the witness is not governed by the decision of the committee, the matter must be brought before the house ; and before the house can determine whether the question is proper or not, the whole of the previous investigation before the committee must be laid before the house—a course that would be attended with the greatest inconvenience—for.

Briggs *a.* Mackellar.

in many cases such committees sit during adjournment of the house, or after the session is over, and in this State such examinations may be taken by order of the house or of a committee before a person in any part of the State, or the committee itself may be conducting its investigation in another part of the State from that where the legislature is sitting, in some of which cases, at least, it would be impracticable to obtain the sense of the house. Still, it is in the power of a witness to refuse, for the committee have no means to coerce him. A court of justice may coerce a witness and compel him to answer, because the court has to decide the matter before it; but it is not the office of a committee to decide; they simply investigate and recommend, the ultimate power or decision being in the legislative body by whom the committee were appointed. The case, however, must be a very strong one in which a witness would be justified in refusing to answer a question after the committee had resolved that it was a proper one, and in which a legislative body, upon being appealed to, would not be disposed to regard the refusal rather as proceeding from perverseness in the witness or from the wish to embarrass the action of the committee, than simply from a desire, on his part, to protect his rights.

It remains, then, but to consider whether the witnesses in this case were justified in refusing to answer the questions put to them, either upon the ground that the Board of Aldermen had no right to investigate the matters referred to the committee, or upon the ground that the questions were not relevant or pertinent to the matter under investigation.

Under the first resolution of the 5th February, 1855, the committee had no power to examine these witnesses or any other person but the Chief of Police. The resolution directed the committee to ascertain from the Chief of Police why he had so long delayed his report, and when they had made that inquiry of Mr. Matsell, or had examined him, their powers, under this resolution, were spent. Their right to examine the respondents as witnesses must rest upon the second resolution authorizing them to inquire as to any frauds or corruption in the Police Department, and as to the manner in which that department was conducted, which presents the

objection mainly relied upon by the respondents, that the Common Council have nothing to do with the Police Department, it being organized under a special statute, separating it altogether from the legislative action or control of the Common Council. I do not, however, understand such to be the effect of the act of April 13, · 1853, under which the Police Department is at present organized. It has made many important alterations and changes, but there is nothing in the act to show that the department is to be conducted entirely independent of the Common Council; but, on the contrary, provisions exist in the act, plainly indicating that the Common Council are to maintain a supervision and watchfulness over the department. The appointment of the Chief of Police and of the police officers is vested in other hands—the Mayor, the Recorder, and the City Judge, in whom also is vested the power of removal. The rules or regulations to be adopted for the discipline, conduct and government of the police officers are to be prescribed by the Mayor, the Recorder, and the Chief of Police; and the qualifications of officers, policemen and doormen are prescribed by the act itself. In respect to these matters, the Common Council exercise no power. The act specifies the duties of the Chief and of his subordinates, but there is nothing in it to prevent the Common Council from imposing by ordinances additional duties upon all or any of the officers constituting the department. On the contrary, the act itself plainly declares that they shall watch and guard the city, in accordance with rules and regulations prescribed in conformity to the ordinances of the Common Council, the laws of the State, and of the United States. These rules and regulations are to be in conformity with the ordinances of the Common Council; and, as the Common Council have the power of altering the existing ordinances, or of enacting additional ones, it follows that, to this extent, at least, the Common Council exercise a supervisory and directing power over the department. That they do, and that it was the intention of the legislature in the passage of this act that they should, appears still more clearly from section 5 of article 3, by which the Chief of Police is required to report to the Mayor, once at least every six months, on the state of the police in practical

Briggs *a.* Mackellar.

operation, with such other information in his possession as may promote the welfare and efficiency of the department, with such suggestions as he may deem proper, which report the Mayor is required to transmit to the Common Council within five days after he receives it, if the Common Council are then in session, or if not, at the first meeting of the next regular session thereafter, accompanying it " with such remarks and suggestions as he, the Mayor, may deem proper." It is very plain, from this provision, that it was intended that the Common Council should be kept advised of the state and working of the department, that abuses might be corrected, or that it might be made more efficient, either by the passage of ordinances which the Common Council may have the power to enact, or by applying to the legislature for the enactment of laws essential to render it more useful or efficient. I have no doubt, therefore, that it was competent for either branch of the Common Council to institute an inquiry into the state and condition of the Police Department—to inquire respecting any frauds or corruption, and generally to inquire into its conduct and management. Such was the nature of the resolution referred to this committee, and under it they had the right to examine witnesses, and it was the duty of the witnesses to answer any question falling within the purpose of the resolution.

The two questions asked Webster had reference to his nativity, and the witness McCann was asked of what country he was a native. These questions were irrelevant. The committee were directed to inquire or investigate as to any frauds or corruptions in any branch of the Police Department, and the manner in which it had been conducted, and they were confined to that subject, and could not enter upon any other. Whether an inquiry as to the nativity of the persons composing the Police Department would or would not be an appropriate subject of inquiry, on the part of the Common Council, it is not necessary to determine. It is sufficient that it was not embraced in the resolution referred to the committee. But this witness refused to answer any other question the committee might ask him, a refusal entirely unwarrantable, and

Vol. II.—5

which renders him liable to be proceeded against as for a contempt.

The witness McCann was asked his name, how long he had been upon the police, and what ward he was attached to; all of which questions he should have answered. He was also asked whether he had ever been in prison in this or in any other country. How much might be comprehended under this question, or what facts the inquiry started by it might elicit, it is impossible to judge of upon the mere statement of the question, and I therefore think that it should have been answered. If it had led to proof that the witness had been convicted, in this or in any other country, of an infamous crime, though that circumstance would not disqualify him under the act of 1853, from serving as a policeman, the propriety of appointing such persons might very well be taken into consideration by the Common Council, with the view of procuring modifications or changes in the thereafter law. This witness also refused to answer any question the committee might put to him, and thereby placed himself in the same position as the witness Webster.

The respondent Mackellar was asked six questions, all of which should have been answered. They related first, to his position and the nature of his duties in the Police Department, the salary he received, and whether he received any compensation above his salary. It was not very material to inquire what office he held, or what salary he received, as both facts could be ascertained at once by reference to the Corporation Manual; but the nature of his duties and whether he received any compensation above his salary were material questions. Mr. Mackellar is the clerk of the Chief of Police; his duties are not defined by the police law, other than that he is required to perform all such duties as the Chief of Police shall direct; his salary is fixed by the Board of Supervisors, and his appointment is made with the approval of the Board of Aldermen. In his case, therefore, these inquiries were certainly relevant. The nature of his duties, and whether he received, in virtue of his position, any compensation beyond his salary, were matters in respect to which it was competent for the committee to inquire, under at least that part of the resolution directing

them to inquire as to the manner in which the Police Department was conducted. He was then asked whether he had paid six hundred dollars to one thousand dollars from the dog pound surplus since the last meeting of the committee, and why he had retained the money in his hands so long. This was a subject especially within the province of the Common Council. They had passed an ordinance requiring the muzzling of dogs while abroad in the public streets, under certain penalties, and authorizing the killing of them, while found running at large, by any person, and the appointment by the Mayor of persons, at a fixed rate of compensation, to seize and kill them while found loose or at large in the streets. (*Ordinances, ch. lxvi.,* 1845). No provision had been made for impounding them, and the Mayor, it would seem, in the absence of any regulation on the subject, had established a dog pound, and intrusted the charge of it to the Police Department. It was competent for the Common Council to take the whole subject under consideration, and to pass an ordinance to establish a dog pound, under such regulations as they might deem expedient; and the manner in which the dog pound was regulated or managed in the Police Department, was a legitimate and proper subject of inquiry. The remaining question asked of Mackellar was what disposition had been made of a large black trunk sealed or locked, that was received in the office of the Chief of Police, some time previous, and of which no account had been rendered? This came directly within the resolution of inquiry, and should have been answered. It is due, however, to Mr. Mackellar to observe, that like the other two witnesses, he refused to answer any questions having reference to the conduct and management of the Police Department; not, as he states in his affidavit, from an unwillingness to give a full and perfect account of all his acts and proceedings in and about the matters inquired of, and of his whole conduct since he has been connected with the Police Department, but because, acting under advice, he conceived that the Board of Aldermen, or their committee, had no right or authority to make such an inquiry. This objection he interposed at the commencement of his examination, and instead of a specific refusal to answer each particular question, he relied throughout on this general

objection.   He further sets forth, as affording countenance to
the objection he made, that one of the three members com-
prising the committee dissented from all its acts and proceed-
ings, and was not present when the questions referred to were
propounded to the witness.

Much has been said in the discussion of the case about the
merits of this investigation—the manner in which it has been
conducted, and of the motives which led to it.   But the only
point that arises on this application is, whether the Board of
Aldermen had the right, and whether the questions put by the
committee were competent, under the resolution referred to
them.   I am of opinion that the Board had the right, and as it
involved the exercise of a discretionary legislative power, the
manner in which the Board or its committee have used the
discretion committed to them, is not a matter to be inquired
into or reviewed here.

The right of the committee being now determined, it is pre-
sumed that these witnesses will submit themselves for exami-
nation.   An order,* therefore, will simply be made that they
appear at the next meeting of the committee, and be exami-
ned, touching any matter embraced by the resolution of March
15, 1854, upon receiving notice from the chairman of the
committee of the time of its next sitting, when, should they
fail to attend, or attending, refuse to testify, an attachment
will be granted for that refusal, and for refusing to answer the
questions already propounded to them, and which have been
determined to be proper.

---

* The following is the order, as settled by Judge Daly :—

IN THE NEW YORK COMMON PLEAS.

Before the HON. CHARLES P. DALY, one of
        the Justices of the  New York Com-
        mon Pleas.

In the matter of the application for an attachment
        against WILLIAM MACKELLAR, TIMOTHY WEB-
        STER, and MICHAEL McCANN, for a contempt   } *June* 18, 1855.
        in refusing to testify before a Committee of the
        Board of Aldermen of the city of New York.

Three several orders having been made by the Honorable Lewis B. Woodruff,
one of the Justices of this Court, on the 3d day of May last, under and by virtue of

an act of the Legislature of this State, entitled " An act to enable the Common Council of the City of New York to take testimony in matters referred for investigation or inquiry," passed Feb. 9, 1855, requiring the said William Mackellar, Timothy Webster, and Michael McCann, each and severally, to show cause before one of the Justices of this Court, why an attachment should not issue against each of them, pursuant to the statute in such case made and provided, they having been duly subpœnaed, and having attended before a Committee of the Board of Aldermen, and refused to answer certain questions propounded to them by said Committee, or any questions the Committee might ask them.

Now, therefore, on filing said petition and the papers thereto annexed, and after hearing Messrs. A. Nash and W. C. Noyes, in support of the prayer of said petition, and Messrs. Burchard and Brady in opposition thereto, and mature deliberation being had thereon,

It is ordered that the attachment issue, unless the said William Mackellar, Timothy Webster, and Michael McCann, the witnesses mentioned in said petition, appear severally, at the next meeting of the said Committee of said Board of Aldermen, upon receiving one day's notice from the Chairman of the said Committee, of the time and place of holding its meeting or sittings, and answer the questions mentioned in the depositions annexed to said petition, except the two questions asked the witness Webster ; and the third question asked the witness McCann ; and also testify and give evidence respecting the matters embraced by the resolution, a copy of which is annexed to said petition, passed by the said Board of Aldermen, on the 26th day of April, 1855, authorizing said Committee to investigate all frauds and corruptions in every branch of the Police Department ; and, also, the manner in which the same is and has been conducted.

---

On the continuance of the examination, in September, 1855, the witnesses still declined to answer, and an application for an attachment, pursuant to the tenor of Judge Daly's opinion, was made. It then appeared, however, that the order made by Judge Daly had been served upon the witnesses only by delivering to them a printed copy ; the original signature of the judge to the order not having been exhibited to them. Therefore the application was denied.

See also page 156 *post.*