By the court,

Nelson, J.
The defendant insists that the statute under which he has been convicted is inoperative, upon the grounds, 1. That the power or franchise of the corporation of the village of Ogdensburgh to grant licenses to grocers to sell spirituous liquors to be drank in their houses is a vested right, and cannot be impaired or taken away; and 2. That if *328 guch power can be taken away, it can be done only by bill having the assent of two-thirds of the members elected to each branch of the legislature, in conformity to the 9th § of the 7th art. of the constitution of the state.
As to the first objection urged by the defendant. The only limitation to the powers of the legislative department that can exist, must be found either in the constitution of the United States or of this state, or in the natural and inherent rights of the citizens, which they cannot part with or be deprived of by the society to which they belong. The latter qualification is undefined, and perhaps undefinable by any general code, having a just regard to the security of these rights. Some of the constitutions of the states contain a declaration of these powers, and some also declare (and all are no doubt so to be understood) that the enumeration shall not be construed as denying or impairing others retained by the people. We have no bill of rights; though many of the principles usually found in such an instrument are incorporated in the provisions of the constitution. The enumeration was designedly omitted, because unnecessary, and tended to weaken, if not endanger those unnoticed. The limitation or qualification in this respect must depend upon the enlightened wisdom and discretion of the legislature, and the decisions of the judicial department. It is now considered an universal and fundamental proposition, in every well regulated and properly administered government,whether embodiedin a constitutional form or not, that private property cannot be taken for strictly private purposes at all, nor for public without a just compensation; and that the obligation of contracts cannot be abrogated or essentially impaired. These and other vested rights of the citizen are held sacred and inviolable, even against the plenitude of power of the legislative department. If it should by enactment, plain and positive, subvert any or all of these rights, no constitutional prohibition existing in the case, doubts have been expressed whether there be anypower in the government that could interpose and avoid the act. It is not material to examine that question. So far as the rights of person or property belonging to the citizen are concerned, under our form of government, they are generally definitely guarded by the *329 national and state constitutions. And when a plain and palpable violation of private right shall occur, not within the protection of either, and too apparent to admit of a presumption that the act was the effect of hasty or unadvised legislation, it will be time enough to inquire whether the power of the judicial department may not be invoked. It would be indelicate and presumptuous to anticipate such a case.
Vested rights are indefinite terms, and of extensive signification; not unfrequently resorted to when no better argument exists, in cases neither within the reason or spirit of the principle. Rights in one sense vested, that is,vested as it regards every other body or power except the government, are numerous, and the subject of common regulation, and even abrogation. All general and local laws, restraining the free action of the citizen as to person or property, the imposition of burthens and of duties, partake more or less of this character, and may be referred to, in illustration of the remark. Government was instituted for the purpose of modifying and regulating these rights with a view to the general good; and under the constitution, the mode by which it was thought this great object might best be attained, was left to the wisdom and direction of the people themselves, acting through the medium of their representatives. We may concede to the defendant, that if any rights vested under the national or state constitutions, or others inherent and inalienable, and therefore also vested, have been violated by any provision of the revised statutes, such provision is inoperative and void. But if such rights have not been violated, we do not perceive how its penalties can be eluded. Now the defendant’s rights are in no way improperly interfered with by the revised statutes, except so far as there may be an infraction of the corporate privileges of the village, bscause it will not be pretended that the right to sell spirituous liquors falls within the most extended class of vested rights. Nor can it be claimed that the right of any corporator, in his individual capacity, has been at all touched by this statute. It acts solely and exclusively upon the powers and privileges previously conferred upon the whole or aggregate body of citizens by the village charter. It is this power,thus previously granted to the corporation,which *330 the revised statutes intended to modify; not the private rights . v 3 ’ 1 of any individual member of it.
What was the power thus conferred by the village charter? answer, that it was wholly political. Instead of prescribing at their discretion every duty to be performed, and forbidding every act to be- avoided—in a word, directing the whole system of government to be observed and executed—the legislature have merely defined the outlines and leading principles, and conferred upon the inhabitants, within the bounds of the corporation, the power at discretion to fill up, and early them into operation. Strictly speaking, individual rights or private interests are no more involved in the arrangement than they are in the general laws, passed with reference to the government of a town, a county or the state. Their rights, as citizens of the government, subject to its control, and to be so regulated and directed as to harmonize with the general good, are those, and those only, within the contemplation of the charter.
Any person who will look into the powers and privileges conferred upon towns and counties, and their qualified right of self-government in reference to their domestic regulations, 1 R. S. 337 to 342, id. 364, and into the charters of the several cities and villages, will not fail to perceive that the only essential difference that exists between these corporate bodies, arises mainly from the difference in the extent of their territory, the density of their population, and the nature of their occupations. The towns are authorized by the legislature to elect a supervisor, clerk, overseers of the poor, assessors, commissioners of highways, <fcc. on whom the administration of their government in part devolves; and so the charter of this village authorizes the inhabitants thereof to select five trustees, one collector, and one constable, on whom the administration of its government chiefly rests. In each, the powers and duties of the inhabitants and officers are more or less limited and defined, leaving whatever was deemed by the legislature expedient to the exercise of their discretion. The laws regulating each are adapted to their respective peculiar conditions and necessities. The powers delegated within the bounds of each, executive, legislative, and judicial, and the rights *331 vested in the inhabitants or respective corporate bodies, are of the same kind, and designed to accomplish the same end, to wit, the good government, of the place. The modification and regulation of the political rights of the citizens, as members of a community, are the purpose of the laws: private interests are affected no farther than as they may be deemed to conflict, or may in fact conflict with what the paramount authority in the exercise of its discretion prescribes for the interest and welfare of the whole.
It is an unsound and even absurd proposition, that political power, conferred by the legislature, can become a vested right as against the government in any individual or body of men. It is repugnant to the genius of our institutions, and the spirit and meaning of the constitution; for by that fundamental law, all political rights not there defined, and taken out of the exercise of legislative discretion, were intended to be left subject to its regulation. If corporations can setup a vested right as against the government to the exercise of this species of power, because it has been conferred upon them by the bounty of the legislature, so may any and every officer under the government do the same. In the case of the Canal Commissioners, the canalboard, the superintendents of the common schools and salt springs, together with hundreds of other officers in the state, on whom large political powers are conferred, defined and undefined, was it ever dreamt that those powers, in whole or in part, were held by any other tenure than the will of the legislature ? They were created and conferred upon these officers for the public good, and are to be administered by them solely to that end. Their private interests are not only not concerned, but it would be a gross violation of duty in such officers to act in reference to them. The species of power thus conferred is the same as that bestowed upon the inhabitants of incorporated towns, cities and villages. Both are public trusts. The rights are the same to the extent of the power granted. It is obvious, that the principle would soon annihilate all government. Indeed, long before this time, if its authority had prevailed, nothing would have been left in the administration of the government of the state, subject to the action of the law making pow *332 er_ The plain solution of this whole matter is, that political conferred by the legislature is a public trust, to be executed not for the benefit or at the will of the trustee, but for the common weal. How long it shall exist, or in what manner it shall be modified, are questions independent of these depositaries, and belong exclusively to the people to determine, in the mode prescribed by the constitution.
But it is said that if the legislature possess the right to modify the chartér, it can be effected only through the assent of two thirds of the members elected to each branch of the legislature, according to the 9th section of the 7th article of the constitution. Assuming, for the present, that this section applies to public corporations, which will be hereafter examined, I amdisposed todenythisposition in its unqualified extent In regard to this section, there is no doubt considerable difficulty in laying down any fixed rule, and sustaining it by satisfactory reasons, distinguished between the power of the legislature to pass general laws, applicable to every citizen and place within the state for the public good, and which must necessarily act more or less incidentally upon the interests and rights of corporate bodies, so far as they are concerned—and those laws passed for the express purpose of modifying or altering the charters of corporations. As far as such incidental modification extends, the effect is the same : the act of incorporation is altered. A distinction, however, we are satisfied must exist. “A majority of each house (that is, of the senate and assembly,) shall constitute a quorum to do business.” Constitution, art. 1, § 3. And by the common law, and parliamentary usage, a majority Of the quorum are competent to enact a law. “ The assent of two thirds of the members elected to each branch of the legislature shall be requisite to every bill, <fcc. creating, continuing, altering or renewing any body politic or corporate.” Art. 7, § 9. A literal interpretation of this clause, no doubt, would obliterate the distinction above taken; but such an exposition would lead to a perversion of the intent of the framers of the constitution, and would most injuriously and lamentably fetter the legislature of the state. It would exempt these corporate bodies from a great mass of the most wholesome enactments. It is upon *333 the principle of this distinction that the various local and state taxes are imposed, or that the amendment of these laws can bind them—that the numerous prohibitory statutes enforced by the imposition of penalties, can include them—the assessments for state or local improvements made upon their property—their property taken for public purposes or abated when it becomes a nuisance, by majority votes. In fine, the regulation °f the internal police of the state, so far as these institutions are concerned, must rest upon some distinction or qualification like the one alluded to. The clause of the revised statutes under consideration belongs to this portion of the law. It qualifies the mode of vending and using distilled spirits throughout the state, for the purpose of diminishing the evil consequences flowing therefrom—an act tending to promote good morals throughout the land, at least so designed. It will also be readily perceived, that the operation of general laws, passed exclusively with regard to the public welfare, like those above referred to, may not unfrequently forbid the corporator, as a citizen, from doing what perhaps the charter authorized, and so vice versa. Many of the rights and privileges conferred upon these corporate bodies, especially as it regards private corporations, are frequently nothing more than are possessed by each corporator in his individual capacity. The law has clothed the aggregate body with the same for special purposes. Are they more sacred and inviolate when found upon an artificial body, in view of tb > constitution and laws, than when belonging to a natural person ?- The latter derives them from nature and the society to which he belongs—sources as high and authoritative as those from whence the former are drawn. The rights of individuals are confessedly the subject of the general regulation of the state. The immediate object of the government is to control and harmonize them for the benefit of all. Are those conferred upon ideal bodies an exception ?
We are however of opinion that the above view is not required to sustain the modification of the charter in this case, for the reason that the constitutional provision does not apply to public corporations. That the village of Ogdensburgh is “ a body politic and corporate ” is not denied. The charter *334 falls within the definition of Lord Coke and of other approved authors. “ A body politic,” he says, “ is a body to take in succession, framed as to its capacity by policy, and therefore Ca-He<l by Littleton, (§ 413,) a body politic ; and it is called a corporation or body corporate because the persons are made into a body, and are of capacity to taire, grant, &c. by a particular name.” Viner’s Abr. Corp. (a. 2.) A public corporation is also defined to be, “An investing the people of a place with the local government thereof.” This latter description is the most appropriate, and is justified by the history of these institutions, and the nature of the powers with which they were and are invested. The forming of cities into communities, corporations, or bodies politic, and granting them the privilegesof municipal jurisdiction, contribu ted more than any other cause to introduce regular government, police and arts, and to diffuse them over Europe. Some of the cities assumr ed the necessary privileges, and formed themselves into bodies politic under a government established by common consent. Others purchased them from their superiors, or acquired them gratuitously from the generosity of the prince, and to enable him to counterbalance the powers of the aristocracy. The feudal government had degenerated into a system of oppression, and the great body of the people were subjected by the' power of princes, or superior lords, to the most degrading and intolerable servitude. Many of the English charters incorporating cities and towns were likewise acquired by means of an appeal either to the fears, avarice, necessities, or generosity of the crown, and, like those on the continent, are to be viewed, as they in truth are, in the nature of a bill of rights. It was the acquisition of so much liberty, conceded by or extorted from a sovereign claiming nearly absolute power; and hence the idea of inviolability, so generally and justly attached to them. They were constitutional charters, which the crown could not encroach upon without violating the freedom of the subject. Most if not all the leading cases in the books, involving the question of the inviolability of these charters in the English courts, arose between the prerogative of the croton and the corporation. The right or power of parliament in England, or of the legislature here, to interfere with th ese *335 bodies, created as auxiliaries to be employed in the government of the state, would present quite a different question. Viewing these corporations as instituted for the purpose of exercising mere municipal jurisdiction—a power public and political, and which by the constitution itself belongs to the legislative department—do they fall within the fair intent of the two-thirds provision ?
The fact conceded, that they are “ bodies politic and corporate” is not, by fair reasoning, necessarily conclusive. So are towns and counties, for they come within one or other of the above or most approved definitions. They possess every requisite to constitute them corporations, besides being declared to be so by statute, as are also superintendents of the poor and trustees of school districts. 1 R. S. 337, 42. id. 364, 486, 617, 498. Each town, as a body corporate, has capacity to sue and be sued; to purchase and hold real estate; to make such contracts and hold such personal property as may be necessary to its corporate and administrative powers; and to make such order for the disposition, regulation and use of its public property as may be conducive to the interest of the inhabitants. Large powers are also conferred, as has already appeared, in respect to their municipal and domestic regulations. So in respect to superintendents of the poor. It is expressly declared, 1 R. S. 617, § 16, “ they shall be a corporation by the name of the superintendents of the poor of the county for which they shall be appointed, and shall possess the usual powers of a corporation for public purposes.” Large powers are conferred upon them also, to enable them to execute their trust, and especially for the “ good order and government of the place and poor houses belonging to the county, for the employment, relief, management and government of the persons placed under their care.” The trustees elected in a town having lands belonging to it for the support of the gospel, or of schools, or both, “ shall be a corporation for the purposes of their office, by the name of the “ Trustees of the Gospel and School Lot,” in the town in which they are elected. They shall have power, “besides the ordinary powers of a corporation,” to manage these lots as particularly set forth in the statute, 1 R. S. 497, 8. Other *336 cases might he referred to.' That they come within the letter °f the provision is not enough, unless the different bodies above alluded to are also included,' which probably will not pretended; for, if so, most of the legislation of the state must be in conformity to this provision of the constitution.
Are they within the evil this provision was designed to remedy ? No one, I think, acquainted with the history of the times, or with the introduction of this clause into the constitution, will venture .upon this ground. It may be fortunate for truth, and what is deemed a sound exposition of this provision, that all who may desire to examine it, can recur to his own recollection, and challenge that of others upon this point. We think we hazard nothing in asserting that the multiplication of cities or villages by the legislature has at no time been a subject of complaint. Only four of the former existed in the state at the adoption of the constitution. The latter, which were somewhat numerous, have always been viewed by the people of the state as a matter in which the inhabitants of the villages were exclusively interested, and to be left to their option. But private incorporations had multiplied to an extent that had attracted public attention, especially banking institutions. These had been sought for with zeal, and their enactment attended with circumstances that awakened public suspicion and alarm. So extreme had the evil become at one period of our history, that the chief magistrate of the state felt it his duty to exercise the power then existing in the constitution, of proroguing the legislature, and was triumphantly sustained by the people in the execution of this high and delicate trust. The fact affords strong evidence of the deep impression made upon the public mind as to these and similar private corporations, and of the scope and purpose of the clause on this subject. If we resort to the history of its introduction into the new constitution, the above view will be confirmed. Mr. King, chairman of the committee of the legislative department, reported the section; and when it came under consideration, said that the committee had looked upon the multiplication of corporations as an evil; they had been created for a great variety of purposes; they were exceptions to the common law; they could not be proceeded against in *337 the ordinary way of prosecutions against individuals in courts of justice ; they ought not to be increased, but should be diminished as far as could be done consistently with the preservation of vested rights. It is obvious, though the language used in the clause in question is general, that the honorable chairman had in his mind (and he spoke for the committee) the case of private corporations ; that the great inducement to the adoption of the clause was a check upon them; and that the organization of communities, and the investing them with the privileges of mere municipal jurisdiction and authority, were not at all in contemplation.
The distinction between public snd private corporations is strongly marked, and, as to all essential purposes, they correspond only in name. We speak of the erection of a town or county, and the term would be just as appropriate when applied to cities or villages. They are severally political institutions, erected to be employed in the internal government of the state. There is no contract between the government and governed, for but one party is concerned—the public; and the inhabitants upon whom the powers and privileges are conferred are mere trustees, who hold and exercise such powers for the public good. The only interest involved is the public interest, and no other is concerned in their creation, continuance, alternation, or renewal. The nature and operation of these corporations repudiate the idea of vested rights, and therefore no evil arising out of them could have influenced the convention. We know of no vested rights of political power, in any citizen or body of citizens, except those conferred by the constitution. That is our bill of rights, and is analogous to those granted to kingdoms or minor communities, such as towns and cities, by princes and superior lords on the continent, or by the crown of England.
Private corporations are the private property of the corpora-tors. They are designed to regulate private interests. Large investments are made in pursuance of their authority, and the tenure by which such corporate property is held is like that of an individual to his farm or personal estate; and an invasion of such corporate power is like a violation of private right. *338 One of the strongest reasons why these private corporations should be cautiously granted, arises from the inviolability of the rights required under them; for, notwithstanding the reserved power in the charter to modify or repeal, an interference seriously affecting this species of property is calculated to shake public confidence in the security of these corporations generally, and might and probably would be immediately disastrous to the property invested under their faith, in the particular instance in which the legislature exercised its reserved power. This wide distinction was well known to the members of the convention, and shows that the clause in the constitution may be fully satisfied by confining its operation to the case of private corporations. Nor can it be admitted that it was intended to restrict the action of the legislature, in the municipal regulations of the state, as to one place more than another, or that less latitude was to be given to such regulations in the government of the citizens residing within the bounds of cities and villages, than of those residing in towns and counties. The nature and object of the power exercised, and the claims of those concerned, are alike, and its difficult to discover any solid reason for the distinction. All our public laws, civil and criminal, however important or severe their operation, enacted for the good government of the people throughout the state, are passed by majority votes ; and it would be inconceivably strange, if laws passed with a view to a more perfect government of a particular place (laws better adapted to the orginazation of society and the business and condition of the governed residing in small districts) should depend upon a different and greatly restricted rule of action on the part of the legislature.
Judgment affirmed.*

 Vide Ex parte Harrington & Hubbell v. The Trustees of the Village of Rochester, 10 Wendell, 547, in which it was held that the provisions of the revised statutes, forbidding the licensing of grocers to sell spirituous liquors to be drank in their houses, extends to every part of the state, (except the city of New York,) including villages the officers of which were authorized by their charters to grant such licenses.