## The People on the relation of Joseph Trombley v. William Humphrey, Auditor-General of the State.

*Eminent domain of state confined to state purposes: Light-houses: Act No. 119 of 1867 held unconstitutional.* This state has no authority, by virtue of its eminent domain, to condemn private lands within its boundaries for the purpose of turning the same over to the United States for the erection and maintenance of light-houses thereon. Act No. 119 of 1867 (*Sess. L.*, *1867, p. 158*), which undertakes to authorize the governor to do this, is unconstitutional, for the reason that its enactments are not within the sphere of state powers, and if put in force would constitute an appropriation of the property of individuals without due process of law.

*Eminent domain defined: Necessity.* The eminent domain is the rightful authority which exists in every sovereignty to control and regulate those rights of a public nature which pertain to its citizens in common, and to appropriate and control individual property for the public benefit, as the public safety, necessity, convenience and welfare may demand. It has its foundation in the imperative law of necessity which alone justifies and limits its exercise.

*Scope of eminent domain of the states.* The states of the Union cannot any more exercise this right within their territorial limits for purposes which, under the division of powers between the United States and the individual states, are within the sphere of the sovereignty of the United States, than as if the two governments were wholly foreign to each other. Such purposes, though, to be accomplished within the territorial limits of a state, are beyond the scope of the eminent domain of such state.

*Eminent domain of the United States: Light-houses.* The United States in the exercise of its sovereignty, and as a part of its provision for the regulation, control and protection of commerce, erects light-houses, and may in the exercise of its eminent domain, by observing the constitutional requirement of making due compensation therefor, seize and condemn the property of individuals for that purpose.

*The exercise of this right for national purposes, not among the ends contemplated in creation of state governments.* The right of eminent domain in any sovereignty exists only for its own purposes; and to furnish machinery to the general government for it to appropriate lands for national objects is not among the ends contemplated in the creation of the state government.

TROMBLEY *v.* HUMPHREY, AUDITOR GENERAL.

*Action of state in this behalf, provisional only.* The United States has never, by any legislation, undertaken to confer upon the states authority to judge of its needs of lands for national purposes or to assess the compensation it should pay, and any such judgment and assessment must, therefore, be wholly provisional and subject to its acceptance and ratification.

*Aid of the state in this behalf, not analogous to its aid in the exercise of the war power.* The aid of the state, as here attempted to be afforded, in obtaining a site for a light-house, is not analogous to the aid it gives the general government in rendering its war power effectual.

*Interest of the state in coast-wise commerce, not involved.* The proceeding under said statute cannot be sustained on the ground of the interest of the state, by reason of its coast-wise commerce, in the establishment of light-houses upon these waters. The statute does not proceed on any theory of state interest.

*Mandamus: State power necessarily involved: Mutuality of the right.* Where, in a proceeding of this nature, the state abandons the proceeding before its completion, and the owner of the lands, sought to be taken, applies for *mandamus* to compel its being carried into effect, the question of the state power is of necessity involved. This right, if it exists at all, must be mutual.

*Consent of state, not condition precedent: Only necessary to transfer jurisdiction.* The consent of the state is not a condition precedent to the taking of lands by the general government. Its consent is required only for the purpose of a transfer of jurisdiction.

*Heard October 4. Decided October 10.*

Application for *mandamus*.

A · sufficient statement of the case is given in the opinion.

*S. M. Green* and *Isaac Marston,* for the relator.

*Dwight May, Attorney General,* and *G. V. N. Lothrop,* for the respondent.

COOLEY, J.

On the 27th day of March, 1867, the legislature of this state passed an act purporting to authorize and empower the governor to seize and take possession of any land, not exceeding one hundred and sixty acres, within the state, for the purpose of conveying the same to the United States, for the erection and maintenance of light-houses thereon. For this purpose he was to appoint three commissioners, who were to enter upon, and take possession of, the land in the name of the state, cause the same to be surveyed and

platted, assess the value thereof, to fix the compensation to be paid by the state therefor. Their decision was to be filed within twenty days after being made, and thereupon the title to the land seized was to be vested absolutely in the state, and the owners and claimants of the land were to be paid from the state treasury the sum awarded. And the governor was further empowered to convey the land, so seized, to the United States on being paid the amount awarded, together with the expenses incurred in the proceedings. On the 24th day of February, 1869, certain amendments were made to this act, which, however, are not of importance in our present discussion.

On the 14th day of November, 1870, the governor having previously been notified from the office of light-house engineers, of the desire of the United States to acquire a certain site for a light-house, at or near the mouth of the Saginaw river, appointed three commissioners to enter upon, and take possession of, the same, and appraise the value and fix and determine the compensation to be paid therefor conformably to the requirements of the act aforesaid as so amended. These commissioners proceeded as directed, appraised the value of the land and fixed the compensation to be paid at the sum of seventeen thousand four hundred and ninety-six dollars and eighty-four cents, and duly filed their report as required by the act. The officer in charge of the light-house department, however, when informed of this report and award, immediately notified the governor that the sum awarded was regarded as excessive, and was, moreover, greater than the appropriation made by congress for the purpose; and for these reasons the acceptance of the land for light-house purposes was declined. Thereupon the governor apprised the commissioners of the conclusion, but the owners of the land, claiming that the title had passed by the proceedings to the state, insisted on being paid the

sum awarded, and having demanded from the auditor-general a warrant for such payment and been refused, one of them has instituted this proceeding to compel the issue and delivery of such warrant.

The state resists this application on various grounds, some of which go to the regularity of the proceedings merely. The view we take of the legislation, however, does not render it necessary to consider objections of mere form, because we think the acts in question have no constitutional warrant, and consequently all the proceedings taken to condemn land under them are void.

If the state has authority to condemn the lands, it must be by virtue of its eminent domain; and it is to this that the right is referred by the relator's counsel. The eminent domain may be said to be the rightful authority which exists in every sovereignty, to control and regulate those rights of a public nature which pertain to its citizens in common, and to appropriate and control individual property for the public benefit, as the public safety, necessity, convenience and welfare may demand. The authority springs from no contract or arrangement between the government and the citizen whose property may be appropriated, but it has its foundation in the imperative law of necessity, and is recognized, and may be defended and enforced, upon the ground that no government could perpetuate its existence and further the prosperity of its people, if the means for the exercise of any of its sovereign powers might be withheld at the option of individuals. The right being thus found to rest upon necessity, the power to appropriate in any case must be justified and limited by the necessity; and whenever in any instance the government or its officials shall attempt to seize and appropriate that which cannot be needful to the due execution of its sovereign powers or the proper discharge of any of its

public functions, the same means of resistance and legal redress are open to the owner that would be available in case of a like seizure by lawless individuals.—*Matter of Albany Street, 11 Wend., 151.* Any employment of the power for other purposes than to enable the government to exercise and give effect to its proper authority, effectuate the purpose of its creation and carry out the policy of its laws, could not be rested upon the justification and basis which underlie the power, and consequently would be wholly unauthorized and inadmissible.

The states of this Union possess the eminent domain for all legitimate purposes under their own sovereignty. They may take and appropriate lands for roads, canals, state-houses, court-houses, school-houses and many other purposes needful to enable them to accomplish the objects for which their governments have been created by their people. But there are other public objects which, though to be accomplished within their territorial limits, are just as much beyond the scope of the eminent domain as possessed and exercised by them, as they would be if to be accomplished within the exclusive jurisdiction of a foreign nation. Under the division of powers between the United States and the individual states, each has its sphere of sovereignty, within which it moves and operates without let or hindrance from the other, and within that sphere it employs the eminent domain wherever needful to the complete and effectual exercise of its powers, and with as little occasion or necessity for the permission or assistance of the other as if the two governments were wholly foreign to each other, instead of being constructed as parts of one harmonious system. For the one to enter the sphere of the other and employ its officers and machinery in the exercise of its eminent domain for the benefit of the other would not only be as much without warrant, but also as much a work

of supererogation, as for the United States to exercise the like authority and employ the like agencies in a foreign country in order to appropriate individual property therein for the benefit of the government of such foreign country, which, as a sovereignty, had powers of its own fully adequate to the purpose.

In the exercise of its sovereignty, and as a part of its provision for the regulation, control and protection of commerce, the United States erects light-houses, and may without question seize the property of individuals for the purpose, observing the constitutional requirement of making due compensation therefor. To do this, would be but an ordinary exercise of the right of eminent domain. But when the state undertakes to do the same, not for any purposes of its own, but in order to turn the property over to the United States, the difficulties appear to us insurmountable. In the first place there can be no necessity for the exercise of this right by the states for this purpose, for the authority of the nation is ample for the supply of its own needs in this regard under all circumstances. In the second place, the eminent domain in any sovereignty exists only for its own purposes; and to furnish machinery to the general government under, and by means of, which it is to appropriate lands for national objects, is not among the ends contemplated in the creation of the state government. Thus we perceive that the foundation upon which must repose the right to appropriate individual property against the will of the owner under the eminent domain, is wholly wanting in the case before us. We do not doubt that the appropriation would have been effectual had the United States seen fit to accept the land and the owners to receive the compensation awarded; for a statute may transfer the title to land in any form the parties mutually assent to,—*Embury v. Conner, 3 N. Y., 511;* but until the

assent of both is signified, the proceedings are and must be wholly inoperative.

When we look into the legislation of congress, we discover also that the United States has never undertaken to confer upon the states authority to judge of its needs of lands for national purposes, or to assess the compensation it should pay. Any such judgment and assessment must consequently be wholly provisional, and subject to its acceptance and ratification. If in the mean time the title to land seized could vest in the state, and the state could be required to make payment therefor as is attempted by this proceeding, we reach the extraordinary result, that the state may seize and appropriate the lands of an individual for the sole purpose of turning it over to the Union for its needs; while on the other hand the Union is at liberty to accept it or not at its option, and if it shall refuse, the state, whose position in the taking was that of agent merely, without any interest whatever of its own, must, nevertheless, retain and pay for the land, while the owner, who was subject to this obligation only, that he should surrender his property to the public needs, is found to have been deprived of it on a claim of necessity which the government repels, and has no security against its being appropriated to any private purpose for which the state authorities may find it advantageous to sell it. This simple statement appears to us to demonstrate that the state can have no such power as has been attempted to be exercised in the case before us. It is of no importance in this proceeding that the federal authorities, at first, expressed a desire for the appropriation of the land. Their request to that effect was withdrawn before the relator's demand was made.

It was suggested on the argument that the aid of the state in obtaining a site for a light-house, is analogous to

the aid it gives the general government in rendering its war power effectual in time of hostilities. But we are unable to perceive the analogy. The duty to aid in a war in which the nation is engaged is one which is incumbent on every individual citizen, and the machinery of the states may very properly be employed to ensure the performance of that duty. The power, which the federal constitution recognizes in the states to arm and discipline the militia, and to employ military force to suppress insurrection and repel invasion, implies as much. The parties to a war are the government and people of the nation on the one part and the enemy on the other; and whatever injury an individual citizen may do to the enemy, not contravening the laws of war, is justifiable, and, from the stand-point of his nation, commendable. But there is no duty resting upon either state or individual citizen to aid the nation in the condemnation of land for light-house purposes, nor does the nation need their assistance in such a proceeding. The parties to it are the nation on the one side and the property owner on the other; and any interference of a third party, except as he may be called in to judge between them, is mere impertinence. It would be absurd to hold that an individual might intervene, and of his own motion seize and hold the property of his neighbor, in order to turn it over to the nation if the nation should see fit to take and use it, but until we are prepared to hold this, we shall be compelled to deny to the states the like power, and upon the like reasons.

It is suggested by the eminent counsel for the relator that the proceeding may be sustained on the ground of the interest of the state, by reason of its coast-wise commerce, in the establishment of light-houses upon these waters. But the act does not proceed on any theory of state interest. It assumes that

the taking is to be for the United States exclusively. It is not necessary for us to consider, therefore, what might be the result were the theory of the act different.

What power the state may have to purchase lands with the voluntary consent of their owners, in order to turn them over to the nation for light-house or any other national purposes, is not in question before us. We confine our remarks to the precise case at bar, which brings under examination a proceeding for the compulsory taking of lands. The state abandons the proceeding before its completion; the individual seeks to compel its being carried into effect. The right to do so, if it exists at all, must be mutual, and the question of state power is consequently involved of necessity.

We attach no importance to the circumstance that no law of congress can be shown empowering the general government to condemn lands for light-house purposes. When congress discovers a necessity for such legislation there can be little doubt of its adoption. We think counsel is in error in supposing that the assent of the state is a condition precedent to the taking of lands by the general government. Its consent is required only for the purpose of a transfer of jurisdiction. The power of the general government is ample, and the only question we are to discuss is the authority of the state in cases in which the right of federal action is unquestionable, to step in and act for it.

It is said in Comyn that "Parliament cannot do any thing out of its jurisdiction; as it cannot make a person inheritable in France."—*Com. Dig.*, *"Parliament,"* (*K*). The English courts have frequently recognized and acted upon the doctrine that offenses can be punished neither at the common law nor under statutes except by the sovereignty against which they are committed. Thus in *Butler's Case*, referred to in *13 Rep.*, *53*, and again in *3 Inst.*, *113*, which was a

case of robbery on the high seas, and of a bringing of the goods afterwards within the realm, Lord Coke says the judges held an indictment would not lie, "because the original taking was no felony whereof the common law took conusance, because it was done upon the sea, out of the reach of the common law." The same doctrine was recognized in *2 East P. C., 772; Regina v. Prowes, R. & M., 349; Regina v. Lewis, Dears. & Bell, 182; Vat., 108; Story Confl. L.,* §§ *516, 517.* "The British Parliament," it was said in *Lopez v. Burslem, 4 Moo. P. C. C., 305,* "has no general power to legislate for foreigners out of the dominions and beyond the jurisdiction of the British crown." The cases in which the like doctrine has been accepted and followed in this country are numerous, and some of them elaborately considered. The case of *Simmons v. Commonwealth, 5 Binn., 617,* is one of this description, and we refer further to *State v. Knight, 2 Hayw., 109; People v. Wright, 2 Caines, 213; People v. Gardner, 2 Johns., 477; People v. Schenck, ib., 479; People v. Merrill, 2 Park. C. R., 590; State v. Carter, 3 Dutch., 501; State v. La Blanch, 2 Vroom, 82; State v. Main, 16 Wis., 398; State v. Chapin, 17 Ark., 561; Johns v. State, 19 Ind., 421; Commonwealth v. Uprichard, 3 Gray, 434.* No reference is, of course, had here to offenses against the laws of nations, some of which are offenses against every sovereignty, and consequently may be punished by any one of them.

When we have reached the conclusion that the laws of any state can operate only within the limits of its sovereignty, this case is disposed of. It is not a matter of importance whether those limits are territorial or by defined subjects. This court, in *People v. Tyler, 8 Mich., 320,* felt constrained to confirm a conviction in a state court of one who had committed an offense against the sovereignty of the state, notwithstanding he had been erroneously con-

victed and punished by the local federal court for the same act. On the other hand, in *Spangler's case, 11 Mich., 298,* the court denied its own jurisdiction to inquire into the regularity of an exercise of federal authority, and in *People v. Kidd,* decided a few days since, (*supra p. 440*) it set aside as wholly unwarranted the proceedings of a subordinate court which had attempted to restrain a federal executive officer from obeying the orders of his superior. The individual sought to be restrained was subject to the sovereignty of the state, and might be punished by the state for his trespasses and crimes, but the sphere of his official duties was outside of that sovereignty, and must be taken cognizance of by the government to which they were due. . Chief Justice Taney, in *Ableman v. Booth, 21 How., 523,* pointed out very clearly "the complex character of our government, and the existence of two distinct and separate sovereignties within the same territorial space, each of them restricted in its powers, and each within its sphere of action, prescribed by the constitution of the United States, independent of the other." The fact that the two sovereignties occupy the same territorial space, so far from constituting a reason why either should exercise authority within the sphere appropriated exclusively to the other, only affords an additional reason for utmost care and solicitude that each may keep within due bounds, lest collisions shall unhappily occur, and exciting and unseemly conflicts arise to threaten the stability of institutions, the perpetuity of which can only be ensured by mutual forbearance and justice, and by strict adherence to the fundamental law.

It may be said that there is no constitutional provision which expressly declares that the state shall have no authority to appropriate property for the public uses of the United States, and that the powers not prohibited may, on general principles, be exercised. But any such express

prohibition would be an act of supererogation. All constitutions are subject to certain implications, which are as effectual limitations upon power as if expressly declared. One of these is that the constitution itself is made to define, limit and apportion the powers of the government it creates or controls, and not those of some other government or authority. On this ground it is that the bill of rights added by amendments to the federal constitution has been held to be a protection against an improper or tyrannical exercise of federal power only, and not to stand between the states and their citizens for the like purpose. —*Barron v. Baltimore, 7 Pet., 243; Fox v. Ohio, 5 How., 410; Smith v. Maryland, 18 How., 71; Pervear v. Commonwealth, 5 Wal., 475; Twitchell v. Commonwealth, 7 Wal., 321.* Another implication is, that the powers, which the constitution defines, limits and apportions are to be exercised within the limits of the sovereignty which creates it, so that a prohibition of their being exercised elsewhere would be a mere idle formality. We are not told by the constitution of this state that its criminal laws shall not apply to offenses committed within the limits of sister states; but an enactment that they should so apply would, as has been well said by the supreme court of New Jersey, be void upon general principles.—*State v. Carter, 3 Dutch., 501.* See also *Johns v. State, 19 Ind., 424.* Neither does the constitution forbid the state punishing offenses against the laws of congress; but if the state should attempt to punish acts which are offenses only against such laws, it would be only a profitless and futile attempt to reach and regulate subjects outside the limits of its authority. The constitution, *Art. VI, § 32,* does expressly provide that no person shall be deprived of life, liberty or property, without due process of law; and that cannot be due process of law in any case which rests upon legislative enact-

ments either not properly legislative in their nature, or relating to subjects not within the sphere of the sovereignty enacting them. This court held, in *People v. Salem, 20 Mich., 454,* that a legislative act originating proceedings by, or in pursuance of, which, individual property was to be taken under the forms of taxation for the benefit of a private corporation, could not be justified as an exercise of legislative power. It was not, therefore, due process of law. In many cases the courts, while recognizing to the fullest extent the right of the legislature to exercise discretionary legislative authority except as forbidden, have nevertheless enforced the implied limitation that the authority exercised, which assumes to be legislative, must be legislative in fact. —*Bowman v. Middleton, 1 Bay, 252; Wilkinson v. Leland, 2 Pet., 627; Terrett v. Taylor, 9 Cranch, 43; Ervine's Appeal, 16 Penn. St., 266; People v. Morris, 13 Wend., 328; People v. Draper, 15 N. Y., 543, per Denio, Ch. J.; Wynehamer v. People, 13 N. Y., 391, per Comstock J.* If a power is not within the general delegation of authority made by the people, it cannot be necessary to forbid its exercise by a department whose whole authority comes from the delegation. Such is the case here. The authority delegated to the legislative department is to legislate for the state, and not for the nation.

For the reasons assigned, the legislation in question is void. The enactments before us could not be adopted by the legislature, because not within the sphere of state powers. They, therefore, constitute an attempt to appropriate the property of individuals without due process of law; and the state authorities were justified at any point in abandoning the proceedings taken under them.

The writ applied for is denied.

CHRISTIANCY, J., and CAMPBELL, CH. J., concurred.

GRAVES, J., concurred in the result.