STATE EX REL. THOMAS FURNACE COMPANY vs. CITY OF MILWAUKEE.

*February 28—April 9, 1914.*

*Constitutional law: Commerce: Federal and state control: Harbor improvements: Approval of plans: Navigable waters: Title and interests in river bed: Effect of conveyance to United States: Eminent domain: Changes in water channel: Procedure: Milwaukee city charter: Statutes construed.*

1. Under the commerce clause of the federal constitution the United States has a certain control over navigation and its incidents, including improvements of navigable rivers and bridges spanning the same. This is paramount to but not ex-

clusive of state control of the subject, which is much broader and extends to many regulations with which the federal gov, ernment does not concern itself.

2. Where money is appropriated by Congress for the improvement of a harbor, subject to the condition that the plans therefor shall be approved by the federal government, the form and manner of approval are matters for the administrative department of that government.

3. The mere fact that land sought to be condemned by a city for the improvement of its river harbor was to be conveyed to the United States as a condition of receiving a federal appropriation, did not affect the right of the city to take the property. The city would acquire only an easement, and a conveyance by it, even though expressly authorized by the state legislature, would not confer proprietary rights upon the United States nor in any way impair the authority of the city or the state over the new river bed.

4. In the original river bed there were three interests: (1) that of the riparian proprietor, who held a qualified title; (2) paramount to this the public interest represented by the state, for the purposes of navigation or improvement; and (3) paramount to these two the governmental or sovereign interest of the United States which it might exert in aid of navigation or other incident of interstate commerce; and the enlarged bed created by condemnation proceedings has the same legal status as the former river bottom.

5. *It would seem* that the provision in sec. 30, ch. VI, of the Milwaukee city charter giving the common council power to change the location of any water channel or slip and the location and direction of any river, in view of the connection in which it is found and the reference in the same section to ch. 129, Laws of 1873, relates to the Kinnickinnic river so far as made a public river under said ch. 129, and not otherwise.

6. In a proceeding to take land for the improvement of the Kinnickinnic river, it appearing that dock lines had been previously established at the place in question under sec. 20, ch. 129, Laws of 1873, or at least that there had been an attempt at compliance with that act,—it follows that the city has power under its charter to take land for the widening of the channel of that river.

7. Where the particular improvement contemplated is such an one as is provided for in secs. 926—108 to 926—113, Stats., those sections must be complied with, and, because they relate to the particular subject, must have controlling force and effect.

8. The words of sec. 926—108, "a complete system of waterways, canals, slips, revetments, docks and bridges intended to be

constructed or improved," were not intended to leave the question of the completeness of the system to the determination of a court or jury, but they mean a system completely outlined so far as intended to be constructed and so far as agreed upon between the city and the federal government.

9. Such a complete system was settled upon and determined when the representatives of the federal government approved the plans for the improvement of the Kinnickinnic river proposed by the city officials.

10. The requirements of sec. 926—110, that the plan when approved shall be filed in the office of the board of public works and a duplicate recorded with the register of deeds, and that the common council shall thereupon promptly and permanently locate by ordinance all dock lines and revetments in conformity thereto, are substantial, not merely directory; and the riparian owners have the right to insist that the commands of the statute in this respect be followed.

11. The changes referred to in sec. 926—110, required to meet the approval of the federal government, are to be made before the establishment of the permanent dock lines.

12. After the permanent dock lines are once established with the approval of the federal government, the city is impliedly prohibited from changing them, and the taking of land inside of such dock lines is contrary to the purposes of the act and unauthorized.

13. The reference in the act of Congress of June 25, 1910, to House Document No. 667, which was accompanied by a map on which were indicated in red certain localities "where dredging is to be done," which points were inside the then established dock lines, did not have the effect to change such dock lines or to confer on the city the power to take the lands for that purpose.

14. The city acquires its power of eminent domain by delegation from the state, not from the United States.

15. Where the petition for condemnation shows that the power of eminent domain is invoked under and pursuant to secs. 926—108 to 926—113, Stats., for the purpose and in aid of the project there mentioned, the map and survey accompanying the same should correspond on its land side with the permanent dock line established in the manner therein provided, otherwise the proceeding will be void.

16. Whatever general power of condemnation the city of Milwaukee may have under its charter is restrained in its exercise, limited, and qualified by secs. 926—108 *et seq.*, when it is exercised in the particular case there mentioned.

CERTIORARI brought under sec. 926q, Stats., to review a judgment of the circuit court for Milwaukee county condemning land for public use: W. J. TURNER, Circuit Judge. *Reversed.*

For the relator there was a brief by *Lewis M. Ogden,* attorney, and *Frank M. Hoyt,* counsel, and oral argument by *Mr. Ogden* and *Mr. Louis J. Brabant.*

For the respondent there was a brief by *Daniel W. Hoan,* city attorney, and *Mark A. Kline,* assistant city attorney, and oral argument by *Mr. Kline.*

TIMLIN, J.    This case can best be considered by taking it up at first from three several viewpoints; that is to say, from the viewpoint of the United States government, its relations to the subject under consideration and the requirements of its laws and regulations; second, the same as to the state; third, the same as to the city of *Milwaukee.*

Under the commerce clause of the United States constitution the federal government has a certain control over navigation and its incidents, including improvements of navigable rivers and bridges spanning the same.    This is paramount to but not exclusive of state control of the subject, which is much broader and extends to a great many regulations with which the federal government does not concern itself at all. For illustration: The state acting directly or through a municipal corporation fixes dock lines or builds a bridge, but not so as to obstruct or impair navigation.    The United States controls its own purse also and can make such condition upon its donations as it pleases.    In the instant case the United States appropriated money to improve or aid in the improvement of the Milwaukee harbor.    This donation was upon two conditions: first, the federal government should approve the plan; second, that lands acquired by the city for the purpose should be transferred to the United States.    The approval of the plan, in the nature of things, should precede the acquisi-

tion of the land by the city, and for good reason the conveyance to the United States should follow the acquisition of the land. The United States did approve quite a comprehensive plan. This was not so comprehensive apparently as the original plans, and the approval is criticised. But it is sufficient. The form and manner of approval is a matter for the administrative department of the United States government. The dock line so approved was established by ordinance. The subsequent proceedings in Congress and by the War Department contain nothing definitely altering or changing the dock line so approved.

This disposes of the questions relating to the United States except the claim that the city could not condemn the property for the purpose of turning it over to the United States. This is stating the matter too strongly, and it assumes that this was the purpose of condemnation when it was only an incident. When the city, acting under a delegated power of eminent domain, condemns property for public use, such as a street, the city thereby acquires no proprietary interest therein. After condemnation the city would have no more interest in this enlarged river bed than it had before condemnation in the former river bed. Neither had the United States any proprietary interest in the former river bed. It had limited rights there as a sovereign but not as a proprietor. By the deed to the United States its rights were in no degree enlarged. Sovereign authority is not conveyed or acquired by deed. So that as far as the United States and the city were concerned the requirement of a deed was quite a formal, harmless, and ineffectual ceremony, insisted upon by the War Department probably from excess of caution, but in no degree changing the relation of the parties to the new river bed. Prior to the making of the new bed there were three interests in the ancient river bed; first, that of the riparian proprietor, who held a qualified title. Paramount to this the public interest represented by the state, for the purposes of navigation

or improvement. This was a governmental or sovereign interest and not a proprietary interest. Paramount to these two was the governmental or sovereign interest of the United States which it might exert in aid of navigation or other incident of interstate commerce. After the condemnation the easement acquired thereby reduced this new river bed to the same legal status as the former river bottom. Only an easement is acquired. Sec. 28, ch. VI, Charter. I think it cannot affect this that the legislature of the state by sec. 926—113, Stats., authorized the city to donate or transfer the title to the land taken or acquired to the government of the United States for the purpose of complying with the condition imposed by the United States upon the disbursement of its money in aid of the project. The city, notwithstanding this proposed conveyance, would be still condemning for public use and the public use would be in no wise impaired, the authority of the city or state such as it is fixed by law in no wise impaired by the grant, because neither the city nor the state would acquire by the condemnation any other right therein than the right to devote the property to the same public use, regulated by the same laws to the same extent as before. It is as if the city by the authority of the legislature of the state should convey to the United States by deed a public highway. This conveyance would not make the highway any less a public use, would carry no proprietary interest therein, because the city and the state had none except as trustee for the public, and would not diminish the city or state authority over it, for, as said before, that is not to be conveyed by deed.

*Trombley v. Humphrey,* 23 Mich. 471, 483, approved in *Kohl v. U. S.* 91 U. S. 367, is readily distinguishable. There the United States refused the site, and the city had no authority to condemn for that kind of a public use in which neither the state nor the city represented the public but a use solely and exclusively under the regulation of the fed-

eral government, which rejected the proposed site. This case is rather controlled by the principle of *Lancey v. King Co.* 15 Wash. 9, 45 Pac. 645, 34 L. R. A. 817. See, also, 1 Lewis, Em. Dom. (3d ed.) § 309 and cases cited.

2. The next question is, Was there any jurisdictional error in the proceeding, having regard to state statutes? Secs. 926*l* to 926*s* prescribe a convenient mode of procedure which was followed, but do not purport to confer the power of eminent domain on the city. The petition must show a public purpose permitted by the charter of such city or by some law of this state applying to such city. Sec. 926*m*. One law of this state applying is found in secs. 926—108 to 926—113; another in the city charter of *Milwaukee*. Sec. 19 of ch. VI of the charter reads:

"Whenever any . . . river, canal or waterway shall be laid out, widened or enlarged, under the provisions of this chapter, the board of public works shall cause an accurate survey, plat and profile thereof to be made."

A somewhat similar provision is found in sec. 926*m*, Stats. 1913, and the city attorney for some reason claims to have proceeded under the latter.

This was done, but differed from the dock line approved by the United States. Sec. 21 provides that the directions given in this chapter shall be deemed only directory, and no irregularity or informality in any of the proceedings under the chapter shall affect the validity of the proceedings. Sec. 28 of ch. VI provides that as a result of the condemnation the city shall thereupon and *thereby acquire and have the right to the use of such lands for such purpose forever, which is not the acquisition of a fee simple.* Sec. 30, ch. VI, seems to limit the taking of property for opening and constructing the water channel of the Kinnickinnic river. It is provided:

"In case it shall be necessary to take any property for the purpose of opening . . . and constructing the water channel

of the Kinnickinnic river, when the same shall be adopted and established, recorded and filed, as provided by section 20 of chapter 129 of the Laws of 1873, the same proceedings shall be had as are in this chapter prescribed for the taking of property for public squares, grounds, streets and alleys; the common council shall have power to vacate any canal or slip or any part thereof for the same reasons and upon the same proceedings being had that are prescribed in this chapter for vacating streets in said city, and the said common council is hereby authorized and empowered to change the location and direction of any canal, water channel or slip and the location and direction of any river within the corporate limits of said city, upon the same proceedings had as are prescribed in this chapter for changing the location or direction of any street in said city," etc.

It is a close question whether the part of this sec. 30 following the semicolon in the above quotation is independent of that provision relating to the channel of the Kinnickinnic river preceding that semicolon. If it is, there is a clear authority given to "change the location of *any* water channel or slip and the location and direction of any river within the corporate limits of said city."

Ch. 129, Laws of 1873, was an act to consolidate and amend the act to incorporate the city of *Milwaukee* approved February 20, 1852. Sec. 20 of that act declared that the channel of the Kinnickinnic river should not exceed 200 feet in width, and provided for a survey and plat of the river, establishing and re-establishing the dock lines thereof so as not to exceed 200 feet in width from its mouth to the south line of the said city. It prescribed what this survey and plat should contain, that it must be approved by the common council, that the effect of the approval, survey, and filing of the plat would be to vest in the city all lands covered by the said water channel of the river so established as if the plat had been made, acknowledged, and recorded by the owners thereof, provided, however, that no lands belonging to private persons and not dedicated or conveyed by such owners should

be taken until compensation should be ascertained and paid. It is then provided that the said water channel, when so adopted and established by the common council, would be a public river, subject to all laws and regulations applicable to it as such. This would seem to indicate that the part of the quoted section above following the semicolon mentioned related to the Kinnickinnic river *as so made a public river,* but not otherwise.

We now come to the inquiry, What is the effect of the failure on the part of the city to prove that this step was taken? Sec. 1 of ch. IX of the charter provides that the harbor of Milwaukee shall include the Milwaukee river from Lake Michigan to the dam and all those portions of the Kinnickinnic river and of the Menomonee river, etc., which are in the limits of the city of *Milwaukee.* Sec. 2 of ch. IX provides that whenever the survey and plat of the Kinnickinnic river describing the channel and dock lines of said river shall be made, adopted, established, recorded, and filed as provided by sec. 20, ch. 129, Laws of 1873, the water channel of said river as described and represented by such survey and plat shall be deemed to be and is hereby declared to be a public navigable river. Sec. 3 of ch. IX provides for the establishment of dock lines and wharf lines on the banks of these three rivers. See ch. 184, Laws of 1874.

Plaintiff's Exhibit 23 tends to show that dock lines existed on the Kinnickinnic river prior to the establishment of the present dock line. Reinertsen's map, offered in evidence by the relator, shows original established dock line and original center of river, also the new established dock line. It shows three dock lines. The communication of the city engineer, following the plat for the opening, widening, and extending of Kinnickinnic river, speaks of the new established dock line of the Kinnickinnic river and the old established dock line. This is evidence that there was a dock line established on the Kinnickinnic river prior to 1906, and consequently

evidence tending to show that sec. 20, ch. 129, Laws of 1873, had been complied with, or at least that there was an attempt at compliance with that law; consequently that the power of eminent domain as delegated to the city by the sections above referred to included the widening of the channel of the Kinnickinnic river.

We find no cause for reversal upon any of the foregoing grounds. But when we come to the state statutes referring specifically to this improvement and grouped as secs. 926—108 to 926—113 a difficulty arises. These statutes should be also complied with, and because they relate to this particular subject or this particular improvement have controlling force and effect. The project having finally settled down to the improvement of the Kinnickinnic river designated on the plat "Exhibit A," approved by the War Department of the United States, the statutes last referred to take up the matter at this point. The words of sec. 926—108, "a complete system of waterways, canals, slips, revetments, docks and bridges intended to be constructed or improved," are not intended to leave the question of the completeness of the system to the determination of a court or jury. These words are not well chosen, for who can say that any system is complete unless he have a standard of measurement or comparison? The quoted words must mean a system completely outlined so far as intended to be constructed and so far as agreed upon between the city and the War Department of the United States, or, in other words, the United States government. This complete system was settled upon and determined when the representatives of the United States government approved the plan Exhibit A proposed by the city officials. Sec. 926—110 recognizes this, because the plan proposed by the city is to be open to changes and modifications as circumstances may require in order to meet the approval of the United States government. Having been settled upon in this way, the plan so approved is to be filed in

the office of the board of public works and a duplicate recorded with the register of deeds of the county. Thereupon it becomes the imperative duty of the common council to promptly and permanently locate by ordinance all dock lines and revetments in conformity thereto. The state legislature therefore considered this plan so approved as a thing of great importance and reasonable permanence, and directing dock lines to be established in conformity thereto in effect forbade the establishment of dock lines conflicting therewith. These dock lines marked the boundary between the private property of riparian owners and the public easement to be acquired by condemnation. Their location materially affected the value of riparian property and must in many cases have had an important bearing on the amount of damages to be awarded for the taking of land on the river side of these dock lines so established. Consequently the provisions mentioned are substantial, not merely directory, and the riparian owners have the right to insist that the commands of the statute in this respect be followed.

The purposes contemplated by the act (secs. 926—108 to 926—113) are very apparent. Reasonably permanent dock lines having the approval of the United States government and intended to mark the boundary between private riparian lands and lands subject to the public easement must, according to the apparent purposes of the act in question, have also marked the boundary of the land to be taken by condemnation. The statute (sec. 926—113) reads: "Any land needed for any of the purposes contemplated by this act may be taken or acquired . . . by condemnation as in other cases." Land inside these permanent dock lines is not land needed for the purposes of this act, but is rather land taken contrary to the purposes of that act, because it disregards the established dock line, establishes an irregular dock line, and follows no official or authentic dock line of any permanence whatever, and is therefore taken contrary to the purposes of

the act in question, besides causing serious damage and inconvenience to the riparian owner not contemplated by the statute.

The changes contemplated by this act and to be approved by the United States government are to be made before the establishment of the permanent dock line. No doubt the legislature could change or authorize a change in this permanent dock line, but the city is impliedly prohibited from so doing. To take land on the land side of such permanent dock line is to change the dock line if such land so taken is to be used for purposes of navigation; or it is to take private property for no public use if the land taken is not to be used for the purposes of navigation. It must be constantly kept in mind that the city acquires its power of eminent domain by delegation from the state, not from the United States. It seems to have been thought that after the establishment of the dock line in 1906 pursuant to the state statutes above referred to the United States authorized a departure therefrom by reference in the act of Congress of June 25, 1910, to House Document No. 667, which document was accompanied by a map of the city and contained the following: "The localities where dredging is proposed to be done are indicated in red on the accompanying map." The act of Congress referred to is entitled: "An act making appropriations for the construction, repair and preservation of certain public works on rivers and harbors, and for other purposes." But this did not purport to authorize such departure and could not authorize it. No lines or boundaries are given. There is a small blotch of red at or about the place in question apparently somewhat triangular in outline with no measurements or other means of identification. The most that could be claimed for this is that which it purports to be, viz. a designation of the locality where dredging is proposed to be done by the city and that this locality is satisfactory so far as the federal government is concerned. This can have no effect

to extend the power of the city or to alter existing dock lines or to say what shall be condemned, but merely serves to desig-. nate the locality where dredging shall be done; presumably shall be done according to established law.

Claiming to proceed under sec. 926m, Stats. 1913, the common council directed and the city engineer made a survey and plat of the land proposed to be taken in the instant case. Either by error in surveying or in the belief that the reference in House Document No. 667, *supra,* had power to suspend the statutes of this state, this survey and plat described part of the relator's land and intruded about eight feet inside the permanent dock line near the southerly end thereof and about twenty-five feet further into the river than the permanent dock line at its northerly end, thus taking from it at one end more land than authorized by secs. 926— 108 *et seq.* and depriving it of the advantage of this permanent dock line at the other. All the relator's land is improved with extensive improvements. The learned counsel for the city now seeks to uphold the proceeding, claiming that aside from secs. 926—108 *et seq.* the city had power. under its charter to widen the channel of this river, and that the proceeding may be supported partly under this power and partly under secs. 926—108 *et seq.* It is true that the city has by its charter power to condemn land for the purpose of widening the channel of a river, but the petition for condemnation shows that the power of eminent domain was invoked in this case under and pursuant to secs. 926—108 *et seq.* for the purpose of and in aid of the project there mentioned. It is also apparent that whatever general power of condemnation the city had under its charter is restrained in its exercise, limited, and qualified by the provisions of secs. 926—108 *et seq.* when it is exercised in the particular case there mentioned. So that the city gains nothing by pointing to two or more original and general grants of power. In the instant case we have the city proceeding in disregard of the

statutes last cited, and it matters not how broad its general grant of power if it is being exercised in the particular case contrary to the statutes governing that case. We are not, however, to be understood as saying that the city could justify its proceedings under several different statutes when there exists a statute containing provisions specific and particular and relating to the subject of condemnation in the case before the court. We express no opinion on that. But it seems quite certain that provisions relating to the exercise of power in the case in hand modify and qualify all general grants of power so far as they can be invoked to support such case in hand. The map and survey preliminary to condemnation provided for in sec. 926*m* should, in a proceeding under secs. 926—108 *et seq.*, have been made to correspond on its land side with the permanent dock line there mentioned. Otherwise the imperative provisions of secs. 926—108 *et seq.* may be disregarded at pleasure. The result of such disregard is shown in *Kneeland v. Milwaukee*, 18 Wis. 411; *Myrick v. La Crosse*, 17 Wis. 442; *Bohlman v. G. B. & M. R. Co.* 40 Wis. 157; *Milwaukee L., H. & T. Co. v. Burlington E. L. & P. Co.* 142 Wis. 436, 125 N. W. 932; *Lexington P. Works v. Canton*, 167 Mass. 341, 45 N. E. 746; 2 Lewis, Em. Dom. (3d ed.) §§ 505, 506, and cases cited.

It follows that the judgment must be reversed, with directions to dismiss the proceeding.

*By the Court.*—It is so ordered.